No. 83–706.   LEHMAN, SECRETARY OF THE NAVY, ET AL. *v.* TROUT ET AL.   C. A. D. C. Cir.   Certiorari granted, judgment vacated, and case remanded to the Court of Appeals with instructions to remand the case to the District Court for the District of Columbia for findings of fact, based on new evidence if necessary, on the question what evidentiary value respondents' and petitioners' statistical evidence has in light of the Court of Appeals' conclusions of law concerning employment decisions that are not actionable in this case.   See *Pullman-Standard* v. *Swint,* 456 U. S. 273, 292 (1982).   The overall sufficiency of the evidence should then be considered in light of *United States Postal Service Bd. of Governors* v. *Aikens,* 460 U. S. 711 (1983).

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

This litigation began in 1973.   In four consolidated cases a class of female professional employees employed by the Naval Command Support Activity of the Navy Regional Data Automation

Center (NAVCOSSACT/NARDAC) alleged that petitioners discriminated against them on the basis of their sex in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. §§ 2000e to 2000e–17.  After a long trial— the record includes the testimony of 42 witnesses and over 7,500 pages of exhibits[1]—the District Court found discrimination in both hiring and promotion.  *Trout* v. *Hidalgo,* 517 F. Supp. 873 (DC 1981).  The findings were supported by statistical evidence, expert testimony, and nonstatistical evidence covering specific instances of discrimination.

The Court of Appeals affirmed the District Court's finding of discrimination in promotion, but held that petitioners were not responsible for the hiring discrimination that had been proved—another federal agency[2] had done the discriminatory hiring—and also that petitioners were not liable for discriminatory conduct prior to 1972.  226 U. S. App. D. C. 357, 702 F. 2d 1094 (1983).  Thus, the "employment decisions that are not actionable in this case" are (1) hiring decisions, and (2) pre-1972 discrimination.  The order the Court enters today requires that this case be remanded to the District Court for additional findings of fact on the evidentiary value of respondents' statistical evidence in the light of these two conclusions.  The Court's decision overlooks the fact that both the District Court and the Court of Appeals have already done exactly what the Court orders.

The Court of Appeals has already considered the impact of both of the District Court's errors on its findings concerning discrimination in promotion, and has squarely held that those findings are adequately supported by the remaining evidence.  Thus, with respect to the pre-1972 discrimination, the Court of Appeals stated:

> "By grouping nonactionable *hiring* decisions with those for which NAVCOSSACT/NARDAC could properly be held liable, certain of the plaintiffs' statistical analyses hold the potential for some distortion concerning the adverse impact of the appellants' post-1972 promotion policies.  However, it is clear that the plaintiffs did not rely solely on data regarding

---

[1] At least respondents have so represented; I have not examined the record myself because it has not been filed in this Court.

[2] The Civil Service Commission, which later became the Office of Personnel Management.

nonactionable hiring decisions; indeed, there is no doubt whatsoever that the plaintiffs' statistical analyses included a substantial amount of data concerning post-1972 employment decisions affecting class members. For these reasons, we do not believe that 'failure to factor out time-barred discrimination discredited the analyses. Statistics tuned to the proper time period are more probative than statistics not so tuned, but categorical rejection of the latter is not warranted.' *Valentino* v. *United States Postal Service*, [218 U. S. App. D. C. 213, 228, n. 26, 674 F. 2d 56, 71, n. 26 (1982)]. The approach to statistics adopted by the Supreme Court in *Hazelwood* [*School District* v. *United States*, 433 U. S. 299, 309–310 (1977)], and *International Brotherhood of Teamsters* v. *United States*, 431 U. S. [324, 360 (1977)], plainly suggests that statistics including time-barred decisions are 'sufficient to support a prima facie case and shift the burden to the defendant to show that its actions during the relevant period rebut the inference of discrimination raised by the plaintiff's broad summary.' *Movement for Opportunity & Equality* v. *General Motors Corp.*, 622 F. 2d 1235, 1258 (7th Cir. 1980).

"Although the appellants did attempt to make such a showing, the trial court found their statistical evidence defective on other grounds. We can find no basis upon which to overturn Judge Greene's findings on this point. Therefore, we agree that the appellants' evidence was incapable of raising a genuine issue concerning the validity of the inference of discrimination raised by the plaintiffs' statistical presentation. As a result, NAVCOSSACT/NARDAC was left with only an unquantified theoretical objection that could not undermine the prima facie case. *See* II Jt. App. 743–744." *Id.*, at 367, 702 F. 2d, at 1104 (emphasis in original; footnote omitted).

With respect to the fact that the Civil Service Commission, rather than petitioners, was responsible for the hiring discrimination, the Court of Appeals wrote:

"We conclude, therefore, that the District Court erred in holding that the class was entitled to relief for discriminatory *initial placements*.

"This does not mean, however, that the plaintiffs' statistics could not make out a legally sufficient prima facie case of discrimination *in promotions*. Because NAVCOSSACT/

NARDAC did not quantify the extent to which the disparity between men and women revealed by the plaintiffs' statistics was attributable to the locked-in effects of nonactionable discrimination, *see, e. g.,* IV Jt. App. 1829, the plaintiffs' statistical analyses created a justifiable inference that the defendants had 'failed to promote equitably individuals who were discriminated against at hiring,' or had slowed the progress of women who had initially been properly placed." *Id.,* at 368, 702 F. 2d, at 1105 (emphasis in original) (citation omitted).[3]

Thus, the Court of Appeals carefully considered the effect of the District Court's errors, and found that the remaining evidence was nevertheless sufficient to support a finding of discrimination. I take the Court's citation of *Pullman Standard* v. *Swint,* 456 U. S. 273, 292 (1982), to mean that it believes that the Court of Appeals found the facts on these two points, rather than permitting the District Court to do so in the first instance. If that is the basis for the Court's disposition, it is mistaken. The District Court clearly found that even when only post-1972 evidence was considered, respondents had demonstrated the existence of unlawful discrimination both through statistical[4] and nonstatistical[5] evi-

---

[3] The Court of Appeals also emphasized that nonstatistical evidence supported the District Court's findings. It stated: "The District Court also found persuasive the testimony of a number of class members. Although we do not specifically discuss this testimony, the District Court properly considered the statistical and nonstatistical evidence on a cumulative basis in assessing the strength of the plaintiffs' prima facie case. *EEOC* v. *American Nat'l Bank,* 652 F. 2d 1176, 1188–89 (4th Cir. 1981), *cert. denied,* [459 U. S. 923] (1982)." 226 U. S. App. D. C., at 362, n. 7, 702 F. 2d, at 1099, n. 7.

[4] The District Court found:

"Plaintiffs' expert also performed several variant regressions, including running of the 1979 model using a population of employees hired only since 1972, when Title VII became applicable to federal employees; running of the 1979 model using subpopulations categorized by agency origin within NARDAC; and running of data for both 1977 and 1979 using a logarithmic, rather than a linear, equation. Each of these variants produced *statistically significant* results which were wholly consistent with those of the basic model." *Trout* v. *Hidalgo,* 517 F. Supp. 873, 879, n. 14 (DC 1981) (emphasis supplied).

[5] "There was testimony from a number of present and former employees of NARDAC concerning various discriminatory practices, long after 1972, including a denial of supervisory opportunities to women, assignment of women to lower level positions, and the preselection of men for supervi-

dence.  Moreover, the District Court found that even if the actions of the Civil Service Commission were nonactionable, the evidence concerning the actions of NARDAC alone still demonstrated the existence of unlawful discrimination.[6]  Most important, the District Court explicitly noted that respondents' statistics demonstrated that during the post-Act period female employees were paid consistently less than male employees even when the factors used by the Civil Service Commission to make placement decisions were considered.[7]  This is simply not a case in which a court of

sory positions.  The Court was especially impressed by the testimony of several former employees of the agency who were very credible witnesses and who related both specific instances and general impressions of discrimination against women at NARDAC.  Some of these individuals left NARDAC for other federal employment and thereafter advanced to higher grades far more rapidly than had been possible at NARDAC."  *Id.*, at 887 (footnotes omitted).

[6] "The government appears to justify . . . ignoring of possible discrimination in initial placement with the argument that NARDAC had no influence on placement decisions, which were allegedly completely controlled by the Civil Service Commission, and that NARDAC therefore would not be legally liable for any bias at the time of hiring.  However, whatever may have been the formalistic Civil Service classification system, defendants failed to demonstrate that NARDAC had no influence on initial grade placement decisions.  In fact, the interplay among job description, assignment to positions, distribution of duties, and classification standards leaves ample room for flexible treatment and hence for variation and discrimination.

"Furthermore, even if all authority for improper initial grade placement were assumed to rest with the Civil Service Commission, the resulting disparities in grade level remaining over several years could still be properly attributable to NARDAC.  In such a case, either NARDAC failed to promote equitably individuals who were discriminated against at hiring (which would constitute direct discrimination by NARDAC) or operation of the Whitten Amendment regulations locked in the effects of earlier discrimination.  In either event, the assumption implicit in defendants' statistics that discrimination in initial placement is irrelevant to their case is incorrect and undermines their analysis."  *Id.*, at 885 (citations omitted).

[7] "Plaintiffs' expert began his analysis with the undisputed fact that the average salary for female employees at NARDAC has thoughout the relevant period been considerably lower than that of males.  At the beginning of that period, in 1972, women earned $2,700 less than men, that is, 82 percent of the male salaries; at the end of the period, in 1979, women earned $4,300 less than men, or 84 percent of the male salaries.  The salary differentials throughout this period reflect the relative concentration of women in NARDAC in the lower civil service grade levels. . . .

"With these salary differentials clearly established, plaintiffs' expert sought to determine next, on a year-by-year basis between 1972 and 1979, whether

appeals has improperly found the facts in the first instance. Thus, we have a finding of fact that has been reviewed and upheld by a Court of Appeals. Our customary practice is to accord such a finding the greatest respect even in cases that have been fully briefed and argued in this Court. See, *e. g.*, *Rogers* v. *Lodge*, 458 U. S. 613, 623 (1982); *Neil* v. *Biggers*, 409 U. S. 188, 193, n. 3 (1972); *Berenyi* v. *Immigration Director*, 385 U. S. 630, 635 (1967). To set such a finding aside without even looking at the record, or at any of the evidence on which it is based, strikes me as a gross violation of the procedures that should constrain our work.

Two other observations concerning the Court's action today are appropriate. First, the strong interest in bringing protracted litigation to a conclusion seems to have no impact on this Court. See *Pennhurst State School and Hospital* v. *Halderman, ante,* p. 126 (STEVENS, J., dissenting). The Court's action today encourages the kind of litigating strategy that gives the party with the greater resources a significant advantage unrelated to the merits of the case. The kind of casual command to begin anew that is reflected in today's order tends to undermine the ability of trial judges to exercise firm control over the progress of litigation.[8] Moreover, this action can only encourage parties to file

---

the disparity could be accounted for by differences between men and women in education and experience, or whether it was more likely to be attributable to sex discrimination. To accomplish this analysis, the expert witness specified for regression a linear model which included dummy variables for level of education, years of NARDAC service, years of other government employment service, years of potential nongovernment experience between date of receipt of last educational degree and date of entry in federal service, and sex. The dependent variable was sex.

"When prior experience and education were thus taken into account, female employees still received substantially lower salaries than men, the yearly differential attributable to sex ranging from $2,200 to $3,500. Since there was never any suggestion by the government that factors other than education or experience could legitimately account for the differences, the Court would clearly have been justified, absent some explanation, to draw the conclusion that equally qualified female employees of NARDAC consistently received lower salaries on the average than male employees and, accordingly, that they had been the victims of improper discrimination." *Id.*, at 878–879 (footnotes omitted).

[8] Petitioners' conduct of this litigation has hardly been a model for future cases. The most persuasive evidence on which petitioners relied in their argument before this Court was not adduced until they filed a motion for reconsideration well after the District Court had decided the case. The Court

more and more petitions asking this Court to engage in factual disputes that we are not equipped to resolve effectively.

Second, this case illustrates the dangers inherent in an excessive reliance on summary dispositions. The District Court and the Court of Appeals had the benefit of extensive briefing, a complete record, and several months of consideration of this case. Today, in summary fashion, we second-guess their considered judgment as to the probative value of respondents' evidence after the most truncated of presentations. It is, of course, entirely possible that the Court has issued the right command as it gallops by this immense record. But if that be true, the Court is just lucky.

I respectfully dissent.

---

of Appeals agreed with Judge Greene that petitioners should have adduced this evidence during trial. Indeed, it found petitioners' conduct indefensible: "We would add that we find it extremely troublesome—in light of the long and complex history of this litigation and in light of Judge Greene's patient and thoughtful treatment of the case—that the appellants would even propose that the trial court reopen and retry the matter. In the context of this case setting, such an adversarial tactic is irresponsible, insensitive to the extraordinary burdens faced by district courts already overloaded with heavy dockets, and wasteful of precious resources of litigants and the judiciary. Viewed in this posture, we consider the appellants' request for reconsideration an affront to the judicial system." 226 U. S. App. D. C., at 369, 702 F. 2d, at 1106–1107.