Joseph J. LEDOUX, Appellant,

v.

DISTRICT OF COLUMBIA

Raymond J. GREENE, et al.,
Appellants,

v.

DISTRICT OF COLUMBIA, et al.

Nos. 86–5377, 86–5378.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 12, 1987.

Decided June 16, 1987.

Joel P. Bennett, Washington, D.C., for appellants.

Charles L. Reischel, Deputy Corp. Counsel, District of Columbia, with whom James R. Murphy, Acting Corp. Counsel, District of Columbia and Karen S. Dworkin, Asst. Corp. Counsel, District of Columbia, Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, EDWARDS, Circuit Judge, and REVERCOMB,[*] District Judge of the United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Opinion concurring in part and dissenting in part filed by District Judge REVERCOMB.

HARRY T. EDWARDS, Circuit Judge:

From October 1, 1977 through September 30, 1978, the Metropolitan Police Department of the District of Columbia ("MPD" or "Department") had in place a voluntary affirmative action plan ("Plan") designed to place "special emphasis" on the hiring and advancement of females and minorities in those employment areas where there existed an "obvious imbalance in the numbers of females and minorities employed."[1] The issue raised by this appeal is whether promotions made with an eye towards achieving the goals of this Plan violated the statutory and/or constitutional rights of certain nonminority and male employees who were denied promotions.

The plaintiffs-appellants are twenty-one present and former employees of the MPD who, at all times relevant to this appeal, were employed in the position of Detective Grade II. In July of 1977, the MPD issued an announcement of vacancies for the position of Detective Grade I, which is an upper-level position within the Department substantially equivalent to the rank of Sergeant.[2] Several hundred Grade II Detectives, including the appellants, applied for a promotion to this position. None of the appellants were among the twenty-four persons (twelve white males, eleven black males and one white female) ultimately selected.

Believing that their failure to obtain promotions was attributable to illegal preferential treatment of blacks and women, the appellants—eighteen white males and three black males—filed discrimination charges with the Equal Employment Opportunity Commission ("EEOC"). After receiving right-to-sue letters from the EEOC, the appellants brought the instant actions against the District of Columbia and several MPD officials ("appellees"). In their consolidated complaints, the appellants alleged, *inter alia*, that they were denied promotions in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

---

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a) (1982).

1. *See* Exhibit 9 to Motion of Defendants to Dismiss the Complaints or, in the Alternative, for Summary Judgment.

2. The MPD consists of civilian employees and sworn officers. Sworn officers, in turn, are employed in either the uniformed or non-uniformed branch of the Department. Uniformed officers enter the force as Privates, and may advance up the promotional ladder from Sergeant to Chief of Police, with intermediate ranks of Lieutenant, Captain, Inspector, Deputy Chief and Assistant Chief. Non-uniformed officers enter the force as Investigators, and ordinarily advance to the position of Detective Grade II after one year of satisfactory performance. Non-uniformed officers promoted to the position of Detective Grade II may seek further advancement along two alternative career paths: they may seek advancement through the uniformed ranks (starting with the rank of Sergeant), or they may apply for promotion to the position of Detective Grade I.

§§ 2000e to e–17 (1982), and the due process clause of the Fifth Amendment.[3]

After a bench trial, the District Court concluded that the MPD had made the challenged promotions pursuant to a voluntary affirmative action plan that was valid under the Supreme Court's decision in *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). *See Ledoux v. District of Columbia*, No. 82–2093, slip op. at 40–42 (D.D.C. May 9, 1986) [Available on WESTLAW, DCT database], *reprinted in* Record Excerpts ("R.E.") 58–60. Partly on this basis, the court entered judgment in favor of the appellees.[4]

Subsequent to the District Court's decision, the Supreme Court decided two cases involving the issue of voluntary affirmative action. The first decision, *Wygant v. Jackson Board of Education*, —— U.S. ——, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), outlines the constraints that the Constitution imposes on voluntary affirmative action plans; whereas the Court's most recent decision, *Johnson v. Transportation Agency*, —— U.S. ——, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), delineates the constraints imposed by Title VII. Both decisions clearly reaffirm the Supreme Court's seminal judgment in *Weber* that voluntary affirmative action is a permissible means by which to remedy the effects of past discrimination and segregation in the work place.

Although the trial court did not have the benefit of *Wygant* or *Johnson* at the time of its decision, it did make a number of factual findings that enable us to assess the validity of the Plan under Title VII. Our assessment, based on the Supreme Court's decision in *Johnson*, is that the Plan passes muster under the statute. Accordingly, we uphold that portion of the trial court's judgment dismissing the appellants' Title VII claims. The trial court's findings, however, do not enable us to evaluate the legitimacy of the Plan under the Constitution. Accordingly, we remand the case to the trial court to determine whether the Plan satisfies the requirements of the Constitution.

## I. BACKGROUND

### A. *The MPD's Affirmative Action Plan*

The affirmative action plan at issue in this case was adopted by the Department in 1977.[5] By its express terms, the Plan was to remain in effect from October 1, 1977 through September 30, 1978. The Department was to submit modifications of the Plan annually to the District of Columbia Office of Human Rights and the District of Columbia City Council. *See* Exhibit 9 to Motion of Defendants to Dismiss the Complaints or, in the Alternative, for Summary Judgment.

The stated short-term objective of the Plan was to "direct" the Department towards the ultimate long-term goal of "total equality" in its work force. To aid in achieving this short-term objective, the Plan directed that "special emphasis" be given to those employment areas where there existed an "obvious imbalance in the numbers of females and minorities employed." On an attached chart, the Plan documented the marked racial and sexual imbalances that existed within the Department, particularly at its highest levels.

---

3. The District of Columbia is subject to the equal protection principles incorporated in the due process clause of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

4. The District Court also based its decision on an alternative holding that we reject as inconsistent with fundamental principles of discrimination law. *See* note 11 *infra*. Because the appellees themselves conceded at oral argument that this alternative holding cannot sustain the trial court's judgment, we focus only on the court's finding that the challenged promotions were made pursuant to a valid affirmative action plan.

5. D.C. Law 1–63, enacted by the City Council in 1976, requires each government agency in the District of Columbia to develop an affirmative action plan. *See* D.C. CODE ANN. § 1–508 (1981). The statute describes as its long-term goal "full representation, in jobs at all salary and wage levels and scales, in accordance with the representation of all groups in the available work force of the District of Columbia." *Id.* § 1–507.

The Plan did not set aside a specific number of positions for females and minorities, nor did it require fixed percentages for any race, sex or ethnic groups in the work force. Rather, the Plan merely stated the Department's commitment to redressing obvious imbalances in applicable employment areas. In recognition of the fact that "budgetary constraints" precluded any immediate expansion of the work force, the Plan further stated that its "greatest impact" would be in the "development of human resources already on hand and in the promotion of current employees."

## B. *Factual Background*

At about the same time that the Plan was put into effect, the Department issued an announcement of vacancies for the position of Detective Grade I, which is the highest-ranking Detective position within the Department.[6] The announcement did not indicate the precise number of positions available. At the time of the announcement, there were a total of six Grade I Detectives in the Department, three black males and three white males. These positions had previously been filled in a single promotion process that explicitly took race into account.

Several hundred Grade II Detectives, including the appellants, applied for promotion to Grade I. The pool of applicants was somewhat limited, however, by the requirements that each applicant have served at least seven years on the force and at least five years as an Investigator or Grade II Detective. These requirements worked disproportionately against women, who, the trial court found, did not enter the Department in significant numbers until the early 1970s, owing to certain discriminatory barriers. *See* slip op. at 24, *reprinted in* R.E. 42. Thus, only three of the several hundred applicants were women.

Under the procedures already in place for making promotions to the position of Detective Grade I, the applicants were rated initially by their immediate supervisor, and then given a final rating by their commanding officer. The ratings included "unsuited," "suited" and "exceptionally-well suited." Final ratings were forwarded to a five person Selection Committee, which was obligated to consider all applications and issue recommendations to the Chief of Police, Burtell Jefferson. The final decision on the promotions rested with Chief Jefferson.

The preliminary rating process yielded a large number of qualified candidates, including fifty-one who were rated "exceptionally-well suited" for promotion. Of these fifty-one candidates, fifteen were black and thirty-six were white. None were women. The Selection Committee then chose nineteen from the list of fifty-one "exceptionally-well suited" candidates to recommend to Chief Jefferson for promotion—eight black males and eleven white males. None of the appellants were among this group of nineteen. In making its final recommendations, the Selection Committee considered the relative qualifications of competing candidates and race.[7]

At trial, the appellants did *not* allege that the consideration of race as one factor *in the selection of these nineteen individuals* violated either Title VII or the Constitution. Rather, their claims of reverse discrimination focused on the events that occurred *after* the list of nineteen names was forwarded to Chief Jefferson for his approval. As the trial court found, Chief Jefferson was not satisfied that the Committee's recommendations met the affirmative action goals set forth in the Department's Plan. Slip op. at 15–16, *reprinted in* R.E. 33–34. The Chief was also disturbed by the failure of the Committee's list to achieve a balance among the various

---

**6.** *See* note 2 *supra*. The Detective Grade I position was created in 1972. Prior to that time, Detectives could only seek promotion through the uniformed ranks.

**7.** At trial, the individual members of the Selection Committee offered slightly different ac-

counts of precise details of the selection process. However, all members of the Committee agreed that they considered a number of factors in paring the list down from fifty-one to nineteen, including relative qualifications and race. *See* slip op. at 11–13, *reprinted in* R.E. 29–31.

"commands" (or divisions) within the Department. *Id.* The Chief determined that the proper way to remedy these problems was to add *qualified individuals* to the list, rather than deny promotions to any of the nineteen Detectives recommended by the Committee. To implement this solution, he instructed his assistant, Bernard Crooke, to discuss possible additions to the list with Committee members.

After consulting with certain members of the Committee, Crooke recommended the addition of five names to the promotion list—one white male, one white female and three black males. As found by the District Court, these five additions reflected an effort at both redressing the imbalance in command representation and meeting affirmative action goals. Slip op. at 17–18, *reprinted in* R.E. 35–36.[8] With the exception of the female Detective, Susan Roberts, the applicants added to the list were among the fifty-one candidates who had been rated "exceptionally-well suited" for promotion. However, Crooke was able to determine from a conversation with a Committee member that Roberts was qualified for promotion, *see* slip op. at 17, *reprinted*

*in* R.E. 35, a fact that the appellants have never disputed.

On April 21, 1978, Crooke submitted a revised list of twenty-three[9] names to Chief Jefferson. Again, none of the appellants were among those recommended for promotion. Upon Chief Jefferson's approval, the twenty-three individuals on the list were promoted to the position of Detective Grade I. The appellants subsequently brought these actions alleging that the *additional five promotions* ordered by Chief Jefferson were made in violation of Title VII and the Constitution.[10]

### C. The Trial Court's Findings

Following a bench trial, the District Court made a number of factual findings relevant to the ultimate legal issue posed by this appeal—the validity of the Department's voluntary affirmative action Plan. Based on its factual findings, the court concluded that the Department's Plan was valid under *United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).[11]

---

**8.** Three of the individuals added to the list (one white male and two black males) were from commands that had not been represented on the original list submitted by the Committee.

**9.** One of the original nineteen persons recommended by the Selection Committee was left off the revised list, apparently due to inadvertence. However, he was promoted when his complaint was brought to the attention of Chief Jefferson. *See* slip op. at 19, *reprinted in* R.E. 37.

**10.** The appellees moved to dismiss the appellants' actions on the grounds that they failed to file their Title VII claims with the District of Columbia Office of Human Rights and the EEOC within the time periods prescribed by statute, *see* 42 U.S.C. §§ 2000e–5(c), (e) (1982), and failed to bring their § 1983 claims, 42 U.S.C. § 1983 (1982), within the applicable statute of limitations period, *see Banks v. Chesapeake & Potomac Tel. Co.,* 802 F.2d 1416 (D.C. Cir.1986). The District Court denied this motion with respect to fifteen of the appellants based on its finding that they were unaware (due in part to the MPD's withholding of the facts) until some time in 1981 that the Department had considered race and sex in making the additional five promotions. However, the court dismissed six of the appellants from the suit based on its finding that they had actual

knowledge of the Department's actions in early 1979, and thereafter did not pursue their claims within the requisite statutory periods. *See* slip op. at 20–22, 32, 42–44, *reprinted in* R.E. 38–40, 50, 60–62. Because these factual findings are not clearly erroneous, we affirm this portion of the trial court's judgment.

**11.** In the alternative, the trial court held that it was unnecessary to analyze the validity of the Plan, because there had been no "but for" causation between the Department's reliance on the Plan and the appellants' failure to obtain promotions. Slip op. at 29–30, *reprinted in* R.E. 47–48. Essentially, the court reasoned that the appellants had been eliminated from consideration for the promotions when the Selection Committee chose nineteen other applicants, and that the appellants had therefore "lost nothing" when the Department decided to create five additional Detective Grade I positions to meet affirmative action and equality in command representation goals. *See id.* at 37–40, *reprinted in* R.E. 55–58. The appellees concede on appeal, however, that this holding has no basis in discrimination law. Once the Department made the decision to create five additional Detective Grade I positions, it was required to fill those positions in a manner consistent with Title VII and the Constitution.

Among the factual findings made by the trial court was that, at the time of the Plan's adoption, there existed a marked racial and sexual imbalance in the upper-level positions within the Department. *See* slip op. at 26, 41, *reprinted in* R.E. 44, 59. As evidence of this imbalance, the trial court cited employment statistics that the Department had included in an attachment to its Plan. These statistics revealed, *inter alia*, that (1) only one female in the entire Department held a rank higher than Sergeant;[12] and (2) while there was approximate racial balance in the lowest uniformed rank, there was a "dramatic" decline in black representation from the rank of Sergeant on up. *Id.* at 26, *reprinted in* R.E. 44. The trial court went on to note that the longstanding imbalances in the higher levels of the MPD had not been addressed prior to implementation of the Department's Plan. In the year prior to adoption of the Plan, for example, whites received sixteen of the twenty-one promotions to the rank of Sergeant and above, while men received all but one. *Id.* at 26–27, *reprinted in* R.E. 44–45. Finally, the court referred to the longstanding "discriminatory barriers" that had impeded equal employment opportunities in the higher levels of the Department. *Id.* at 23–24, *reprinted in* R.E. 41–42.

Having made extensive factual findings, the trial court proceeded to apply the principles of *Weber*—which was, at the time, the only Supreme Court opinion to have addressed the legality of voluntary affirm-ative action in employment. Subsequent to the trial court's judgment, however, the Supreme Court decided two cases bearing on voluntary affirmative action: *Johnson v. Transportation Agency,* —— U.S. ——, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), which elucidates the legal requirements in the context of Title VII, and *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 60 (1986), which considers the issue in the constitutional context. It is against the backdrop of these two recent decisions that we review the judgment of the District Court.

## II. ANALYSIS

### A. *The Legitimacy of Voluntary Affirmative Action as a Remedial Tool*

In analyzing the validity of an affirmative action plan, the threshold issue to be addressed is the origins of that plan. In the instant case, we have before us a plan that was *voluntarily adopted* by the Department in response to a perceived need for remedial action. The voluntary nature of the Department's Plan distinguishes the instant case from those in which "affirmative action" is ordered by a court as a remedy for adjudicated violations of the discrimination laws. *See, e.g., United States v. Paradise,* —— U.S. ——, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987); *Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC,* —— U.S.——, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).[13]

---

**12.** This finding of the District Court should not be taken to suggest that women held a significant number of Sergeant positions. To the contrary, the statistics relied on by the trial court reveal that women held a mere 5 of the 549 Sergeant positions at the time of the Plan's adoption. Black employees in the Department, though fairing somewhat better, held only 131 of these positions. The racial imbalance at the next highest level within the Department was even more conspicuous: of 171 Lieutenants, only 30 were black. *See* Exhibit 9 to Motion of Defendants to Dismiss the Complaints or, in the Alternative, for Summary Judgment. It is not disputed that, at all times relevant to this appeal, blacks comprised over 60% of the District of Columbia labor market.

**13.** There is a third type of plan that is somewhat of a hybrid between the purely voluntary plan and the court-ordered plan. In many cases, an employer will settle a discrimination suit by entering into a consent decree that incorporates an affirmative action plan. *See, e.g., Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* —— U.S. ——, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). This type of plan is "voluntary" in the sense that it is developed and implemented willingly by the employer without judicial compulsion; however, because it is incorporated in a consent decree that disposes of the discrimination charges, it must be approved by the court. The Supreme Court has indicated that, "absent some contrary indication," the validity of such plans under Title VII and the Constitution is to be judged under the same substantive criteria applicable to purely voluntary plans. *See id.* 106 S.Ct. at 3073.

The Supreme Court first confronted the issue of voluntary affirmative action in employment in the *Weber* case. *Weber* involved a voluntary plan negotiated by a private employer, the Kaiser Aluminum and Chemical Corporation ("Kaiser"), and the employees' collective bargaining representative, the United Steelworkers of America ("USWA"). Under the terms of the plan, fifty percent of the openings in an in-plant craft-training program were reserved for black employees. The plan was expressly designed to end when the percentage of black craftworkers in the plant was commensurate with the percentage of blacks in the local labor force. Because the plan had been adopted by a private employer, the sole issue before the Court was whether the plan was proscribed by Title VII.

In upholding the validity of the plan, the Court in *Weber* firmly rejected the argument that Title VII absolutely prohibits private employers from voluntarily adopting race-conscious affirmative action plans. Acknowledging that a literal construction of Title VII would seem to bar the consideration of race in employment decisions, the Court held that such a construction would defeat one of the principal purposes of Title VII—"to abolish traditional patterns of racial segregation and hierarchy." 443 U.S. at 201–04, 99 S.Ct. at 2726–28. The Court went on to observe that Title VII was intended to *spur* voluntary efforts at eradicating the vestiges of segregationist practices, not to place an obstacle in the path of private employers attempting to achieve that end. *Id.* at 204, 99 S.Ct. at 2727.

Having decided that Title VII did not condemn all voluntary, race-conscious affirmative action plans, the Court stopped short of delineating the precise legal standards governing such plans. 443 U.S. at 208, 99 S.Ct. 2729. ("We need not today define in detail the line of demarcation between permissible and impermissible affirmative action plans."). The Supreme Court did, however, develop an analytical framework for assessing the validity of such plans. Under that framework, a court must answer the following two questions: first, was adoption of the plan justified as a remedial measure, and, second, does the plan unnecessarily trammel the legitimate interests of nonminority employees. On the facts before it in *Weber,* the Court found that the need for the plan was amply demonstrated by the existence of "conspicuous racial imbalances" in Kaiser's "almost exclusively white craftwork forces." 443 U.S. at 198, 99 S.Ct. at 2724. The Court then found that the interests of white employees were not unduly infringed by the plan because it (1) did not require the discharge of white workers; (2) did not create an absolute bar to the advancement of whites; and (3) was a temporary measure designed only to attain, not maintain, racial balance in the Kaiser work force. 443 U.S. at 208, 99 S.Ct. at 2730.

For many years, *Weber* stood as the Supreme Court's only word on voluntary affirmative action plans in the employment setting. In each of the past two Terms, however, the Court has issued an important decision outlining in somewhat greater detail the substantive legal standards applicable to such plans.[14] In the next section, we undertake a comprehensive examination of these two decisions. For present purposes, the point to be emphasized is that both *Wygant* and *Johnson,* along with the intervening decision in *City of Cleveland, see* note 14 *supra,* clearly reaffirm the principle that voluntary affirmative action is a

---

14. Recently, the Supreme Court also has had occasion to consider a voluntary plan that was incorporated in a consent decree. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* —— U.S. ——, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986); note 13 *supra.* In *City of Cleveland,* however, the Court had no occasion to consider the substantive legal standards applicable to voluntary plans. Rather, the sole issue before the Court was whether Title VII barred the trial court from placing its judicial imprimatur on the terms of the consent decree. *See id.* at 106 S.Ct. at 3066, 3079–80. In the course of deciding this issue, however, the Court did emphasize the voluntary nature of affirmative action plans that are embodied in consent decrees, and the special place of voluntary action in achieving the remedial purposes of Title VII. *See* 106 S.Ct. at 3072–73.

legitimate remedial tool available to both public and private employers.

*Wygant* involved a voluntary plan that was contained in a collective bargaining agreement between a public school and a teachers union. Under the terms of the plan, the public school was authorized to lay off nonminority teachers before minority teachers with less seniority. A sharply divided court [15] struck down the plan under the equal protection clause of the Fourteenth Amendment, both because it was predicated on a vague notion of "societal discrimination," and because the layoff provision unnecessarily trammeled the interests of nonminority employees. However, as Justice O'Connor highlighted in her separate concurring statement, the Court was clearly of the view that affirmative action was a legitimate means by which public employers could remedy past discrimination in the work place:

> Ultimately, the Court is at least in accord in believing that a public employer, consistent with the Constitution, may undertake an affirmative action program which is designed to further a legitimate remedial purpose and which implements that purpose by means that do not impose disproportionate harm on the interests, or unnecessarily trammel the rights, of innocent individuals directly and adversely affected by a plan's racial preference.

106 S.Ct. at 1853–54 (O'Connor, J., concurring in part and concurring in the judgment); *see also id.* at 1850 (plurality opinion) ("We have recognized ... that in order to remedy the effects of prior discrimination, it may be necessary to take race into account."); *id.* at 1861 (Marshall, J., dissenting) ("[W]hile racial distinctions are irrelevant to nearly all legitimate state objectives and are properly subjected to the most rigorous judicial scrutiny in most instances, they are highly relevant to the one legitimate state objective of eliminating the

pernicious vestiges of past discrimination.").

Almost one year later, in *Johnson,* the Court again took the opportunity to examine an affirmative action plan voluntarily adopted by a public employer. *Johnson* involved a male plaintiff passed over for promotion based on the considerations outlined in the employer's plan. Because the plaintiff did not raise an equal protection claim in the trial court, the Supreme Court considered only the validity of the plan under Title VII. *See* 107 S.Ct. at 1446 n. 2.

The plan analyzed in *Johnson* was virtually identical to the plan at issue in the instant case. The plan identified the imbalances in the agency's work force, and stated that the agency's long-term goal was to attain a work force whose composition reflected the proportion of minorities and women in the area labor force. 107 S.Ct. at 1446–47. As here, the plan acknowledged that a number of factors might preclude the agency from achieving its long-term goal. However, the plan committed the agency to making short-term employment decisions with an eye towards achieving that goal. In short, the plan "authorized the consideration of ethnicity or sex *as a factor* when evaluating *qualified* candidates for jobs in which members of such groups were poorly represented." *Id.* at 1447 (emphasis added). As here, the plan did not set aside a specific number of positions for minorities or women. *Id.*

The Court prefaced its discussion of the agency's plan by reaffirming its conclusion in *Weber* that voluntary affirmative action "can play a crucial role in furthering Title VII's purpose of eliminating the effects of discrimination in the workplace, and that Title VII should not be read to thwart such efforts." 107 S.Ct. at 1451. The Court then turned—as we do now—to the legal constraints imposed upon employers who choose to adopt an affirmative action plan.

---

**15.** The plurality opinion was written by Justice Powell, who was joined in full by Chief Justice Burger and Justice Rehnquist, and in part by Justice O'Connor. Justice O'Connor wrote a separate statement concurring in part and concurring in the judgment. Justice White also wrote a separate statement concurring in the judgment. Justice Marshall filed a dissenting opinion in which Justices Brennan and Blackmun joined. Justice Stevens filed a separate dissenting opinion.

**B.** *The Legal Criteria Against Which Voluntary Affirmative Action Plans are Measured*

In *Wygant* and *Johnson*, the Supreme Court retained and built upon the analytical framework introduced in *Weber*. Together, the two cases firmly establish that, in the employment context, under both Title VII and the Constitution, the validity of an affirmative action plan must be judged by two factors. First, the court must examine whether there was an adequate factual predicate justifying the use of affirmative action. If the court finds that remedial efforts were justified, it must then decide whether the employer's plan unnecessarily trammels the legitimate interests of nonminority or male employees. Under both Title VII and the Constitution, the burden is on the plaintiff to establish the invalidity of the plan. *Johnson*, 107 S.Ct. at 1449; *Wygant*, 106 S.Ct. at 1848.

### 1. Consideration of Any Legitimate Interests of Nonminority Candidates

Jumping ahead to the second prong of the test, it is clear from *Wygant* and *Johnson* that several factors are relevant in determining whether a plan "unnecessarily trammels" any legitimate interests of nonminority or male employees. Conceptually, there appears to be no reason why these factors should differ depending on whether the plan is analyzed under Title VII or the Constitution; if some affirmative action remedy is warranted, but the chosen remedy is unnecessarily burdensome, a less intrusive remedy would be required under both the statute and the Constitution. And, in fact, our examination of *Wygant* and *Johnson* suggests that the Supreme Court's analysis under the second prong of the test does not vary in these contexts.

As the Court made abundantly clear in both cases, the *type* of preferential remedy chosen by the employer is critical in determining whether the plan is unduly burdensome. In *Wygant*, the plurality balked at a preferential *layoff* scheme, finding that less intrusive means of accomplishing a similar remedial purpose—such as *hiring* goals—were available:

> In cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.

106 S.Ct. at 1851 (emphasis in opinion).

In *Johnson*, the Court applied a similar analysis in finding that a preferential *promotion* awarded to a qualified woman did not unnecessarily trammel any legitimate interests of the male plaintiff:

> [P]etitioner had no absolute entitlement to the road dispatcher position. Seven of the applicants were classified as qualified and eligible, and the Agency Director was authorized to promote any one of the seven. Thus, denial of the promotion unsettled no legitimate firmly rooted expectation on the part of the petitioner. Furthermore, while the petitioner in this case was denied a promotion, he retained his employment with the Agency, at the same salary and with the same seniority, and remained eligible for other promotions.

107 S.Ct. at 1455–56 (footnote omitted).

As the above discussion illustrates, a related consideration under both *Wygant* and *Johnson* is whether the female or minority applicant who receives preferential treatment under the plan is *qualified* to be hired or promoted. If a nonminority or male employee "loses out" on an available job or promotion in favor of another qualified candidate, he or she has in a very real sense suffered a less severe injury than if passed over in favor of an unqualified candidate. Of course, in both cases the loss of the employment opportunity is the same. However, the *legitimate expectations* of the applicant are necessarily higher in the latter case, since a qualified candidate usually can legitimately expect to be chosen over an unqualified candidate. Where several candidates are qualified, such expectations are necessarily lower, regardless

of the fact that an employer's rating system may somehow deem one candidate "more qualified" than the next.

Indeed, these points regarding *legitimate expectations* plainly underlie the Court's decision in *Johnson*, where the male employee was "ranked" higher than the competing female job applicant, but the affirmative action taken in favor of the woman was upheld, in part because she was found qualified to perform the job. Another example is seen in *Weber*, where the white male plaintiff was found to have no "entitlement" to participate in the newly-created apprenticeship program—in terms of proven qualifications, lawful seniority, or current occupancy in the job—superior to the entitlement of minority candidates selected pursuant to the affirmative action plan. The obvious point, of course, is that the *expectations* of nonminority candidates do not become *legitimate* merely upon assertion.

■ In view of these common-sense distinctions, the Court is prepared to sanction—under both Title VII and the Constitution—voluntary plans that authorize employers to treat race or sex as a "plus" factor in choosing among *otherwise qualified* applicants. *See Johnson*, 107 S.Ct. at 1455 (relying on the constitutional analysis employed by Justice Powell in *Regents of the University of California v. Bakke*, 438 U.S. 265, 316–19, 98 S.Ct. 2733, 2761–63, 57 L.Ed.2d 750 (1978)). What the Court is clearly not prepared to sanction is a plan that *completely* forecloses employment opportunities to nonminority or male candidates. *See Johnson*, 107 S.Ct. at 1455; *Weber*, 443 U.S. at 208, 99 S.Ct. at 2729.

■ Finally, in assessing whether a voluntary plan unnecessarily trammels any legitimate interests of nonminority or male employees, a court must consider the nature of the plan's objectives. A plan will be considered unduly burdensome if its long-term goal is to create proportional representation in the work force *and freeze that representation in perpetuity*. Such a long-term objective is tantamount to establishing a fixed-quota system, which is plainly impermissible. *See Johnson*, 107

S.Ct. at 1456 ("the Agency does not seek to use its Plan to maintain a permanent racial and sexual balance"). However, an employer may voluntarily adopt a plan the long-term goal of which is "*to attain* a balanced work force, not to maintain one." *Id.* (emphasis in opinion). This more modest goal is permissible because it does not serve to institutionalize the consideration of race or sex; rather, it serves merely as a benchmark against which the employer "may measure its progress in eliminating the underrepresentation of minorities and women." *Id.*

The requirement that plans not seek to establish permanent quotas is simply a restatement of the Supreme Court's holding in *Weber* that voluntary plans must be "temporary." *Johnson* makes clear, however, that the plan itself need not identify an explicit termination point, unless, as was the case in *Weber*, it "sets aside positions according to specific numbers." *Johnson*, 107 S.Ct. at 1456. If the plan merely authorizes the consideration of race or sex as a "plus" factor, and limits its long-term goal to the *achievement* (rather than the maintenance) of racial or sexual balance, it will be considered sufficiently temporary.

### 2. *Remedial Purpose*

Although application of the second prong of the test (involving consideration of any "legitimate interests" of nonminority candidates) does not appear to vary in the statutory and constitutional contexts (indeed, the Supreme Court's analysis of the second prong in *Johnson* borrowed heavily from its constitutional jurisprudence, *see id.* at 1455; *cf. Wygant*, 106 S.Ct. at 1846, 1849–52 (plurality opinion)), the Court explicitly stated in *Johnson* that the Constitution imposes greater constraints on voluntary affirmative action plans than does Title VII. *See* 107 S.Ct. at 1449–50 n. 6, 1452. It necessarily follows, then, that the Constitution is more demanding in the application of the *first prong* of the test, under which a court must determine whether the employer had a sufficient factual predicate for adopting a voluntary plan. And, indeed, a comparison of *Johnson* and *Wygant* re-

veals that the critical distinction between the statutory and constitutional standards lies in the *quantum of evidence* needed to demonstrate that the plan was adopted for a remedial purpose.

Under *Johnson,* the relevant inquiry is whether there existed a " 'manifest imbalance' " in " 'traditionally segregated job categories.' " *Id.* at 1452 (quoting *Weber,* 443 U.S. at 197, 99 S.Ct. at 2724). Under *Wygant,* by contrast, the test is whether the employer had a "strong basis in evidence" for concluding that affirmative action was necessary to remedy the present effects of prior discrimination in the work place. 106 S.Ct. at 1848 (plurality opinion).[16] Whether the employer had the requisite "strong basis" is a factual determination to be made by the trial court. *Id.* The factual findings undergirding this determination must be respected unless clearly erroneous. *See, e.g., Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

Unfortunately, the plurality in *Wygant* did not enumerate the factors that a court should consider in determining whether an employer had a "strong basis" for believing that remedial action was required. This is in contrast to *Johnson,* which explicitly instructs trial courts to focus on the existence of statistical imbalances. *See* 107 S.Ct. at 1452. The two decisions read together, however, do provide some useful insights into the application of the strong basis requirement.

The only Justice who has expressed a view on the nature of the evidence required to establish a strong basis is Justice O'Connor. Writing separately in both *Johnson* and *Wygant,* Justice O'Connor opined that the strong (or "firm") basis test would be satisfied by evidence of a statistical disparity sufficient to support a prima facie claim of discrimination under Title VII.[17] *See Johnson,* 107 S.Ct. at 1461 (O'Connor, J., concurring in the judgment); *Wygant,* 106 S.Ct. at 1856 (O'Connor, J., concurring in part and concurring in the judgment). Importantly, however, the five Justices who formed the majority in *Johnson* —Justices Brennan, Marshall, Blackmun, Powell and Stevens—have never required as much as a prima facie case to justify efforts at voluntary affirmative action, either under Title VII or the Constitution. Indeed, not even the plurality opinion in *Wygant* suggests that there must be a prima facie case in order to justify voluntary affirmative action. Thus, it must be assumed that "strong basis" is something less than a prima facie case.

Even if the Court were to require a prima facie case, however, it is clear that a "gross statistical disparity" alone could satisfy the constitutional requirement of a remedial purpose, as articulated in *Wygant. See Hazelwood School Dist. v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) ("gross statistical disparities . . . alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination"). Indeed, in her separate concurring opinion in *Johnson,* Justice O'Connor concluded that the glaring statistical imbalance in the agency's work force, standing alone, was sufficient to make out a prima facie case of employment discrimination against women. Accordingly, she found that the agency had adopted its plan based on sufficient evidence that remedial action was warranted. Of course, in any case, evidence of actual discriminatory practices

---

**16.** Of course, we recognize that the sharply divided Court in *Wygant* was unable to formulate a single "test" applicable to affirmative action plans challenged under the Constitution. However, the Court in *Johnson* made clear both that *Wygant* was the relevant precedent in the constitutional area, and that the factual predicate needed to justify voluntary plans under the Constitution was greater than that needed to justify such plans under Title VII. *See* 107 S.Ct. at 1446 n. 2, 1449–50 n. 6, 1452. Thus, until the Court indicates otherwise, we must presume that the factual predicate necessary in the constitutional context is the relatively more stringent one identified by the plurality in *Wygant.*

**17.** Justice O'Connor would apply the "strong" or "firm" basis test to any affirmative action plan voluntarily adopted by a public employer, regardless of whether the plan was challenged under Title VII or the Constitution. The Court in *Johnson,* however, opted for the less exacting "manifest imbalance" test in Title VII cases. *See* 107 S.Ct. at 1452.

engaged in by the public employer in the past also will be highly relevant to the determination of whether the employer had a strong basis for believing that remedial action was justified.

## C. Application of the Law of Voluntary Affirmative Action to the Facts of the Instant Case

In this section, we apply the law governing voluntary affirmative action plans, as explicated by the Supreme Court in *Weber*, *Wygant* and *Johnson*, to the facts as found by the District Court. We conclude that the Department's Plan is clearly valid under Title VII, but that further factual findings are necessary with regard to the constitutional claims alleged in the appellants' complaints.

### 1. *Title VII*

■ Under the guidelines established by the Supreme Court in *Weber*, and refined by the Court in *Johnson*, we find that the appellants have failed in their burden to establish the invalidity of the Department's Plan. Accordingly, we affirm that portion of the District Court's judgment dismissing the appellants' Title VII claims.

Under the first prong of the Court's two-part test, we must inquire into whether the plan was justified by the existence of a manifest imbalance in traditionally segregated job categories. On the facts as found by the District Court, this part of the test is satisfied. As outlined earlier, the trial court, in upholding the validity of the Department's Plan, explicitly relied on unchallenged evidence in the record that, at the time of the Plan's adoption, there existed a manifest racial and sexual imbalance

in the higher-level positions within the Department. Specifically, women held only 6 of 807 positions at or above the rank of Sergeant, and blacks held only 174 of these positions. When measured against the percentage of women and blacks in the area labor market, these figures plainly demonstrate a manifest imbalance in the Department's higher-level positions, justifying some effort at voluntary affirmative action.[18] *Cf. Johnson*, 107 S.Ct. at 1446, 1453 (while women comprised 36.4% of the area labor market, they made up only 7.1% of the agency officials and administrators, 8.6% of the professionals, 9.7% of the technicians and 22% of the service and maintenance workers; by contrast, they constituted 76% of the office and clerical workers). The figures likewise demonstrate a manifest racial and sexual imbalance in the Sergeant position, *see* note 12 *supra*, which is of comparable rank to the position of Detective Grade I.

The appellants vaguely suggest in their brief that there appears to be no manifest racial imbalance if the number of blacks in the Department's higher-level positions are compared with those blacks in the labor force who possess the qualifications for those positions. However, even assuming that this were the appropriate statistical data against which the Department's Plan should be judged, *see* note 22 *infra*, the appellants failed at trial to introduce any data that purports to identify those in the District of Columbia labor force who possess the requisite qualifications. Because the ultimate burden of proof in a Title VII case is on the plaintiff, *see, e.g., Johnson*, 107 S.Ct. at 1449; *McDonnell Douglas*

---

**18.** In concluding that there was a conspicuous imbalance in the Department's upper echelons, the trial court relied on the District of Columbia as the applicable labor market, rejecting the appellants' contention that the relevant market was the Standard Metropolitan Statistical Area ("SMSA"), which includes the nearby suburbs of Maryland and Virginia. *See* slip op. at 31–32, *reprinted in* R.E. 49–50. The record makes clear, however, that there was a manifest imbalance in the Department's labor force under either measure. Therefore, we need not decide whether the trial court erred in rejecting the SMSA as the relevant labor market. In their brief on appeal, the appellants do not suggest

that the use of SMSA figures would have demonstrated the *absence* of a manifest imbalance. Rather, with respect to blacks, they contend that the imbalance that admittedly exists under either measure can be explained away as the product of factors other than discrimination; with respect to the imbalance in female representation, the appellants are mute. *See* Brief for Appellants at 23–24. The Court made clear in *Johnson*, however, that the first prong of the test may be satisfied by an adequate statistical showing; the trial court need not venture into the thicket of determining the root causes of the existing imbalance.

*Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the appellants' unsupported contention must fail.[19]

Once it has determined that the voluntary plan was adopted for a valid remedial purpose, a court must next consider whether the plan unnecessarily trammels any legitimate interests of nonminority or male employees. Here again, the Department's Plan passes muster. The Plan does not transgress any of the prohibitions on voluntary plans outlined earlier; specifically, it does *not* call for the displacement or layoff of nonminority or male employees; it does *not* totally exclude such employees from promotional opportunities; it does *not* authorize the promotion of unqualified blacks and women; and it does *not* seek to establish in perpetuity a work force whose racial or sexual composition mirrors that of the area labor force. In fact, the Plan is virtually identical to the one approved by the Court in *Johnson;* it simply authorizes the consideration of race or sex as one factor in choosing among qualified employees, with the long-term goal set as the *achievement* (rather than the maintenance) of racial and sexual balance in the work force. *See* Exhibit 9 to Motion of Defendants to Dismiss the Complaints or, in the Alternative, for Summary Judgment ("The objective of this Plan is to *direct this Department toward total equality in employment in its work force.*") (emphasis added). Pursuant to the Plan, the Department afforded racial and sexual preferences to qualified applicants for promotion to the Detective Grade I position. This was well within the limits of Title VII, as articulated by the Supreme Court in *Weber* and *Johnson.*

### 2. *The Constitution*

Because the District Court had the benefit of *Weber* at the time of its decision, it made factual findings necessary to the ap-plication of Title VII. As we held in the previous section, these findings are adequate, under both *Weber* and *Johnson,* to uphold the validity of the Department's Plan under Title VII. However, the trial court did not have the benefit of *Wygant* when it undertook to examine the validity of the Plan. As a consequence, it did not make factual findings geared to the legal question whether the Plan is permissible under the Constitution. We must therefore remand for further findings because the Supreme Court has made it absolutely clear that the requisite findings in an employment discrimination suit are to be made by the trial court, not the court of appeals. *See Lehman v. Trout,* 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984) (mem.); *Pullman-Standard,* 456 U.S. at 292, 102 S.Ct. at 1792.

On remand, the trial court should make the critical factual determination demanded by *Wygant;* namely, whether the Department had a "strong basis in evidence" for believing that affirmative action was necessary to remedy the present effects of past discrimination within the Department. The trial court may base this factual determination on evidence already in the record, or, if necessary, it may reopen the record for the introduction of additional evidence. The court need not revisit the issue whether the Plan unnecessarily trammels any legitimate interests of nonminority and male employees, since this second prong of the constitutional test is coextensive with the second prong of the statutory test, and we have already held that the Department's Plan did not transgress any of the statutory limitations on the scope of voluntary plans.

Because the Supreme Court has not yet had occasion to review an application of the strong basis test,[20] we are somewhat ham-

---

**19.** Nor did *Johnson* alter these legal principles in any respect, thereby entitling the appellants to a second opportunity to introduce purportedly relevant statistical data. Rather, *Johnson* relied on a long string of Supreme Court precedents which, taken together, clearly elucidate the appropriate statistical analyses and the proper allocation of the burdens of proof. *See* 107 S.Ct. at 1449–53 (citing, for example, *Weber,*

*Hazelwood, Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and *McDonnell Douglas*).

**20.** Because the plurality in *Wygant* found that the layoff provision in the employer's plan was unnecessarily burdensome, it did not consider whether the employer would have had a "strong basis in evidence" for adopting some other type

pered in our ability to provide legal guidance to the trial court concerning what specific factors it should consider on remand. However, this much is clear from *Johnson* and *Wygant*. Because the constitutional standard is somewhat stricter than the statutory standard, a "strong basis in evidence" must be *something more* than a "manifest imbalance in traditionally segregated job categories." It would appear that this something more may be a greater quantum of statistical evidence, evidence of

of preferential remedy. *See* 106 S.Ct. at 1849–52.

**21.** Should the trial court find on remand that any or all of the five challenged promotions were made in violation of the Constitution, it must also consider the issue of an appropriate remedy. During the initial trial, the appellants made no attempt to prove that any one of them would have received one of the challenged promotions had the Department made the promotions without considering race and sex. Failing such proof on remand, the remaining appellants would not be entitled to individualized relief. Rather, the proper remedy would be an order compelling the Department to reevaluate the five promotions under constitutionally adequate criteria.

**22.** In his separate opinion, our colleague, Judge Revercomb, raises three principal points to which we here offer a brief response.

First, the separate opinion suggests that the five promotions at issue in this case were somehow "suspect" because they were made in contravention of the Department's internal procedures. We disagree. Under the Department's internal procedures, the Selection Committee was only empowered to *recommend* qualified candidates to the Chief of Police; the final decision on all promotions rested solely with the Chief. *See* General Order 201 at 10–12, *reprinted in* R.E. 76–78. However, even assuming that the appellants have successfully demonstrated a procedural infirmity in the selection process, this does not entitle them to relief under Title VII. To recover under Title VII, the appellants must prove *illegal discrimination*, not flawed personnel practices. *See, e.g., O'Connor v. Peru State College,* 781 F.2d 632, 638 & n. 3 (8th Cir.1986) ("Title VII protects employees against discrimination—not against all foibles in employment relationships"); *Johnson v. Lehman,* 679 F.2d 918, 922 (D.C.Cir.1982) (rejecting age discrimination claim by analogy to the principle that, under Title VII, the failure of an employer to follow its own regulations and procedures does not in and of itself establish discrimination). As we have demonstrated, the appellants have failed to meet their burden of proving

prior discriminatory practices, or some combination of the two. Beyond this, we leave the necessary factual determination to the trial court in the first instance.[21]

### III. CONCLUSION

To recapitulate, we hold that the appellants have not demonstrated that the Department's Plan was invalid under Title VII, and that the District Court therefore properly dismissed the appellants' Title VII claims of reverse discrimination.[22] We re-

impermissible race or sex discrimination under Title VII.

Second, the separate opinion states that, in considering appellants' challenges under Title VII, we must consider the Department's employment record against the pool of District of Columbia residents "who have the qualifications or potential to be members of the MPD." In response to this contention, we would first note that the approach followed by the Department comports with the one used in both *Weber* and *Johnson,* where the Court made it clear that an employer may consider "as a benchmark for measuring progress in eliminating underrepresentation the long-term goal of a work force that mirror[s] in its major job classifications the percentage of women [or minorities] in the area labor market." *Johnson,* 107 S.Ct. at 1453–54. Furthermore, as we have already noted, *see* text at note 19 *supra,* the appellants did not introduce any statistical data that purports to identify those in the District of Columbia labor force who possess the requisite training or ability to assume the Detective Grade I position. Therefore, even assuming that we should treat this case differently than the Court did with respect to the skilled craft positions in *Johnson,* the appellants' Title VII claims must fail, because in a Title VII suit the burden of establishing the invalidity of an affirmative action plan rests on the plaintiff. *Johnson,* 107 S.Ct. at 1449.

Finally, the separate opinion suggests that there was no racial imbalance to justify affirmative action at the Detective Grade I level because, at the time that the Department decided to expand significantly its Detective Grade I position to implement affirmative action in its higher-level positions, the six existing Detective Grade I positions were held by three white males and three black males. However, the Department, and the District Court in reviewing its action, looked to Sergeant/Detective Grade I positions as a group (because these two positions are at the same employment level), and also to upper-level positions in general, in determining whether remedial action was needed to eliminate longstanding imbalances in higher-level jobs in the Department's work force. This is precisely what was done in *Johnson,* where, although the promotee's specific job designation was that of "road dispatcher," the Court con-

mand the case only for a factual determination of whether the Department had a strong basis for believing that affirmative action was necessary to remedy the present effects of past discrimination within the Department. "The ultimate burden remains with the [appellants] to demonstrate the unconstitutionality of [the] affirmative action program." *Wygant,* 106 S.Ct. at 1848.

*So ordered.*

REVERCOMB, District Judge, concurring in part and dissenting in part:

The majority opinion focuses on a careful legal analysis of affirmative action principles enunciated by the Supreme Court. However, I cannot agree with the entire resulting application of those principles to the cases before the Court.

Appellants challenge the promotions of three black males and one female who were not promoted subject to the MPD's own guidelines.[1] They were not recommended pursuant to full review of the MPD Selection Committee and the female applicant was not rated "exceptionally well-suited." This *ad hoc* process which was utilized makes their promotions initially suspect. Instead of accepting the full committee's original recommendation for promotion of eleven white and eight black males, the Assistant Chief contacted part of the Committee and directed them to increase the number of female and minority recommendations, and to assure that all commands were represented. *See* slip op. at 17–18, *reprinted in* R.E. 35–36. The additional names were proposed without consideration of the full selection committee although a memorandum stated the additional candidates had been chosen by unanimous vote of the committee, in keeping with the Department's regulations. The record from the District Court reveals that this memorandum was inaccurate, which makes the MPD's actions further suspect. *See* slip op. at 18, *reprinted in* R.E. 36.

Although the command representation of several promotees was taken into consideration, the members' sex or race appears to have been a key factor in their advancement. Such factors may be regarded as a "plus" in promotion decisions.[2] However, these decisions must be based on a valid affirmative action plan.[3] The majority affirms the validity of the MPD's plan under Title VII using the "manifest imbalance" test, and remands for further findings under the Constitution.[4] In upholding the plan under Title VII, the majority accepts the District Court's reliance on evidence of sex and race composition imbalance between the Department's overall upper echelons and the entire District of Columbia population between ages eighteen and sixty-five. *See ante* at 1295.[5] I agree with appellants that this reliance is faulty and makes the plan inherently invalid. Under the analysis presented in *Johnson* and *Hazlewood,* the relevant labor market for

sidered *all* "Skilled Craft Workers" in determining whether there was an imbalance, and also took note of imbalances in other traditionally male job categories. *See Johnson,* 107 S.Ct. at 1446–47, 1453. Moreover, the theory enunciated in the separate opinion is *not* the theory that was relied upon by the plaintiffs below (or even in their briefs to this court). Therefore, not only have the plaintiffs failed in their burden of proof, but it cannot be said that they ever advanced the point now being argued for the first time in the separate opinion. *See District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084 (D.C.Cir.1984) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal.").

1. *See* General Order 201 at 7–14, *reprinted in* R.E. 73–80, providing for review of only *outstanding* candidates by full selection committee.

2. *Johnson,* 107 S.Ct. at 1455.

3. *See generally, Johnson,* 107 S.Ct. 1442; *Weber,* 443 U.S. 193, 99 S.Ct. 2721.

4. Given the requirement of the Supreme Court in *Lehman,* 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984), that these findings must be made by the trial court, I concur that the District Court's analysis calls for remand rather than reversal.

5. The plan attempted to mirror D.C. Law 1–63, although this statute provides generally that minority and female representation should parallel the *available* District of Columbia work force. *See* D.C. CODE ANN. 1–507 (1981).

comparison is the pool of District of Columbia residents who have the qualifications or potential to be members of the MPD. *Johnson*, 107 S.Ct. at 1452, 1454; *Hazlewood*, 433 U.S. at 299, 97 S.Ct. at 2736.[6]

On remand, the District Court should be directed to make further findings on the MPD's actions based on a correct statistical comparison. The majority doesn't require the District Court to use the *relevant* labor market for its analysis. Given this inherently faulty comparison basis, I dissent from the majority's affirmance of the promotions under the first prong of the Title VII test, and the limited directives given to the District Court regarding findings using the first prong of the test under the Constitution. The present record does not support the Department's actions under the scrutiny of either test.

Under the first prong of each test, there must be an adequate factual predicate justifying the use of affirmative action. *Ante*, at 1302. At a minimum, there must be a "conspicuous ... imbalance in traditionally segregated job categories." *Weber*, 443 U.S. at 209, 99 S.Ct. 2730.

It is notable that the MPD's plan was designed to place "special emphasis where there is an obvious imbalance in the numbers of females and minorities employed in specific areas." Defendant's Trial Exhibit 9A; *ante* at 1294. The record reveals that at the time the promotees were recommended, these Detective Grade I positions were composed of three black males and three white males. This 50–50 racial composition does not appear to constitute a "conspicuous imbalance" in this job category. However, such a determination cannot be made without comparison to the relevant qualified labor market. Unless the correct labor market is utilized for comparison, the record also cannot support a conclusion that a manifest imbalance exists in the overall upper echelons of the Depart-

ment. The Department's actions may have been valid if the comparison to the labor market reveals an imbalance in minority representation. However, this conclusion cannot be reached absent more specific findings of the District Court.

Accordingly, I respectfully dissent from the portion of the majority's opinion which remands the cases without a requirement of further findings using the qualified labor market.

---

**6.** Although Detective Grade I positions require seven years of MPD experience, this comparison figure is still more appropriate under the Supreme Court's analysis, because it would take into consideration other prerequisites for MPD employment, e.g. age, height, education and background specifications. While these statis-

tics may not be readily available, the Supreme Court emphasized in *Johnson*, in analyzing a voluntary plan which is similar to the plan in issue, the plan's requirement of periodically acquiring data to accurately make the relevant comparison. 107 S.Ct. at 1447, 1454.