Margaret COLLINS, Plaintiff-Appellant,

v.

STATE OF ILLINOIS, Illinois State Library, and Bridget Lamont, individually and in her capacity as former associate director of library development and in her present capacity as acting director of the Illinois State Library, Defendants-Appellees.

Nos. 86–1659, 86–1810.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1987.

Decided Sept. 17, 1987.

---

**17.** *United States v. Kovic,* No 83–2296, unpublished order at 6 (7th Cir. July 23, 1984) [740

F.2d 971 (table) ].

Doris Gregory Black, St. Louis, Mo., for plaintiff-appellant.

Bret A. Rappaport, Asst. Ill. Atty. Gen. (Patricia Rosen), Chicago, Ill., for defendants-appellees.

Before WOOD, and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, JR., Circuit Judge.

Plaintiff Margaret Collins was employed by the Illinois State Library, a state-owned library, in Springfield, Illinois. Plaintiff is black. As a result of frequent and negative evaluations of plaintiff's performance during plaintiff's employment at the library, plaintiff filed grievances through her labor union, and later through state and federal agencies, alleging race discrimination on the part of her supervisor, de-

fendant Bridget Lamont. Shortly after the grievances were filed, plaintiff was transferred by Lamont to another department in the library. Plaintiff eventually filed suit in federal district court alleging race discrimination and retaliation under Title VII and section 1981.[1] 42 U.S.C. §§ 1981 & 2000e et seq. (1982). The bifurcated case was tried to a jury on the issue of liability only. The jury found that although Lamont had not discriminated against plaintiff on the basis of race in the first instance, she had illegally retaliated against plaintiff for plaintiff's filing race discrimination grievances and claims against her. Both sides filed motions for judgment notwithstanding the jury's verdict or in the alternative for a new trial. The district court denied plaintiff's motion, but granted defendants' motion for judgment notwithstanding the jury's verdict. Plaintiff then challenged defendants' motion as having been untimely filed. The district court ruled in a second order that defendants' motion had been timely filed. Plaintiff appeals both the first order that denied her motion for judgment notwithstanding the verdict, while it granted defendants' motion, and the second order that held defendants' motion was timely filed.

## I. BACKGROUND

Plaintiff's career as a library employee began in 1970 when she was earning an associate's degree at Lincoln Land Community College in Springfield, Illinois. Toward the end of her degree program, plaintiff began working as a library assistant in the West Branch of Lincoln Library in Springfield. She continued working at this job as she completed her associate's degree and began work on a bachelor's degree at Sangamon State University, also located in Springfield. Plaintiff finished her bachelor's degree and immediately began a new job as an intern at the Illinois State Library. At the completion of this internship in Springfield plaintiff enrolled at Rosary College, located in the suburbs of Chicago, as a candidate for a master's degree in library science. While plaintiff was earning her master's degree she began working at the Chicago Historical Society. She later worked for the Chicago Public Library at the Cabrini Green Branch. Following her graduation from Rosary College in January 1975 plaintiff transferred to the Kelly Branch of the Chicago Public Library. About one and one-half years later, in May 1976, plaintiff was hired by the Illinois State Library in Springfield, where plaintiff had worked as an intern just after she earned her bachelor's degree. Plaintiff began her work at the library as a cataloguer. Her job performance as a cataloguer was rated by her supervisor as "exceeds expectations" in all nine rating categories.

1. 42 U.S.C. § 1981 (1982) states in full:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 42 U.S.C. § 2000e-2 (1982) states:
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as employee, because of such individual's race, color, religion, sex, or national origin.
 42 U.S.C. § 2000e-3 (1982) states:
 (a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

After a year of working as a cataloguer, plaintiff wanted to transfer to the Library Development Group. The development group coordinates both an information network and the disbursal of federal grant money to over 2000 local libraries in Illinois. Plaintiff wanted to work as a library consultant in the development group. As a library consultant, plaintiff would be expected to consult with local libraries within a particular geographic region in Illinois about the information network and the disbursal of federal grant money.

The director of the development group opposed plaintiff's transfer because he stated that he believed plaintiff did not have the appropriate background or work experience to work as a library consultant. Despite the director's protestations, however, plaintiff was transferred into the library development group. Plaintiff was the only black library consultant in the group.

The director of the development group did not immediately assign plaintiff the full duties of a library consultant and plaintiff complained to the Illinois Secretary of State. Plaintiff was subsequently provided with more responsibility and assigned to specific projects. The director of the development group rated plaintiff's performance as "meets expectations" in all nine categories, even though he had initially opposed her transfer to the development group.

The director of the development group resigned two years after plaintiff had begun working in the development group and defendant Bridget Lamont took his place. Although Lamont evaluated the other library consultants in the development group on an annual basis, she evaluated plaintiff's performance more frequently. Lamont completed evaluations on plaintiff after three months, six months, twelve months, and eighteen months. Plaintiff also was evaluated later for a three-month interval by the director of the library. Lamont's first evaluation of plaintiff rated plaintiff as "meets expectations" in only four categories and "needs improvement" in five categories. Her subsequent three evaluations of plaintiff indicated that plaintiff was in need of improvement in at least half of the nine rating categories. Plaintiff was disgruntled with these evaluations and filed grievances through her labor union. One of these grievances alleged that Lamont had evaluated plaintiff for a period of time during which Lamont had been on leave for six months.

In response to these grievances Lamont had a law firm, on her behalf, send plaintiff's labor union a letter. The letter, a copy of which was sent to plaintiff, threatened that a lawsuit would be filed against plaintiff if her labor union grievances against Lamont were unsuccessful. Plaintiff responded to the letter by filing an additional labor union grievance and by filing race discrimination complaints with the federal Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("ILDHR"). The state's affirmative action office was notified of both sets of claims. Subsequently, on June 1, 1982, a state affirmative action officer sent to her supervisor, William Rolando, a memorandum which was carbon copied to Lamont and Kay Gesterfield, the director of the library. The memo indicated that an internal investigation had commenced and that the principals involved would be contacted. The Illinois affirmative action office typically interviews the principals involved in such complaints within one month of the receipt of the complaint.

Sometime between June 1st, the date the memo was issued, and July 1st, Lamont contacted Rolando, the director of the affirmative action office. Lamont suggested to Rolando that plaintiff be transferred out of the development group. On July 16th, plaintiff was transferred against her wishes from the development group to the Library Reference Unit. Although plaintiff's transfer was lateral and did not result in any reduction of salary or monetary benefits, plaintiff's job responsibilities and accouterments of employment were altered. At the development group plaintiff had specific projects to which she was assigned and for which she had primary responsibility. She had her own office, telephone, and business cards. She was listed

in professional publications as a library consultant. At the reference unit, however, plaintiff was not assigned to specific projects. Her supervisors were unsure of what plaintiff's responsibilities should be—plaintiff's position in the reference unit had just been created at the time plaintiff was transferred out of the development group. Plaintiff no longer had her own office. Her desk was placed outside her supervisor's office in a location where a receptionist's desk typically would be located. Plaintiff had no telephone. She was not allowed to receive printed business cards and she was no longer listed as a library consultant in professional publications.

After working for nearly a year in the reference unit plaintiff filed suit in federal district court against Lamont, the library, and the state of Illinois. She alleged that the poor and frequent evaluations from Lamont were discriminatorily based on race. She claimed these poor evaluations ultimately were used as a basis for denying her raises and promotions. Plaintiff also alleged that after she complained about the purported discriminatory evaluations, Lamont retaliated against plaintiff by having plaintiff transferred out of the development group to a newly created job of lesser status and responsibility in the reference unit. At the conclusion of the trial the jury found that although there had been no race discrimination Lamont had retaliated

against plaintiff as a consequence of plaintiff's complaints.[2]

## II. DISCUSSION

Both sides moved for judgment notwithstanding the jury's verdict. The district court granted defendants' motion, but denied plaintiff's motion. Plaintiff appeals both of those rulings.

■ Our standard for reviewing the district court's grant or denial of a motion for judgment notwithstanding the jury's verdict is *de novo.* *Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 15 (7th Cir.1987); *Kunzelman v. Thompson,* 799 F.2d 1172, 1179 (7th Cir.1986). "In reviewing a district court's decision whether to grant a judgment n.o.v., we examine whether there is substantial evidence to support the jury verdict. We determine whether the evidence presented, combined with all reasonable inferences that may be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict." *Christie v. Foremost Insurance Co.,* 785 F.2d 584, 585–86 (7th Cir.1986). We do not judge the credibility of the witnesses. *Freeman v. Franzen,* 695 F.2d 485, 489 (7th Cir.1982), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983). Nor do we weigh the evidence as a factfinder. Rather, we "weigh the evidence to the extent of determining whether the evidence to support the

---

2. The jury returned two verdicts and one set of special interrogatories. The first verdict read:
 We, the jury, being duly impaneled and sworn upon our oath, unanimously find in favor of Defendant Bridget Lamont as to the claim of race discrimination by Plaintiff Margaret Collins.
The second verdict read:
 We, the jury, being duly impaneled and sworn upon our oath, unanimously find in favor of Plaintiff, Margaret Collins and against Defendant Bridget Lamont on Plaintiff's claim of retaliation for filing a charge of race discrimination.
The special interrogatories were answered as follows:
SPECIAL INTERROGATORIES
 We, the Jury, being duly impaneled and sworn upon our oath, unanimously make the following answers to special interrogatories:
 1. Did the Plaintiff Margaret Collins have any increase(s) in salary withheld because of

her race that were caused by Defendant Bridget Lamont?
 ANSWER: No (yes or no)
 2. Was Plaintiff because of her race, denied promotion to the job classification of Senior Librarian II while similarly situated white employees were hired into that classification by Defendant Bridget Lamont?
 ANSWER: No (yes or no)
 3. Was plaintiff's transfer to reference caused by Defendant Bridget Lamont in retaliation for her filing of discrimination charges against Defendant with the Equal Employment Opportunity Commission and/or the Illinois Department of Human Rights?
 ANSWER: Yes (yes or no)
 4. Was Plaintiff's transfer to the reference unit caused by Defendant Lamont because of Plaintiff's race?
 ANSWER: No (yes or no)

verdict is *substantial;* a mere scintilla of evidence will not suffice." *La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1410 (7th Cir.1984).

## A. *Race Discrimination*

Plaintiff first argues that there was insubstantial evidence for the jury to conclude that Lamont had not discriminated against plaintiff on the basis of race. Plaintiff points principally to the fact that Lamont evaluated plaintiff more frequently than the other library consultants. She also argues that her evaluations were unfairly negative, whereas earlier evaluations had been positive or at least satisfactory. Plaintiff alleges that all this was due to the fact that she was the only black library consultant in the development group and not because she was performing poorly.

■ Defendants' first response to plaintiff's argument is that plaintiff cannot challenge the jury's verdict of no race discrimination because plaintiff never moved for a directed verdict at the close of her own case or at the close of all the evidence. Defendants correctly point out that a party cannot move for judgment notwithstanding the jury's verdict unless a motion has first been filed for directed verdict. *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1388 (7th Cir.1984); *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.,* 532 F.2d 572, 575 (7th Cir.1976); *see* Fed.R.Civ. P. 50(b). Our review of the record and plaintiff's failure to counter defendants' charge in a reply brief convince us that plaintiff did not move for a directed verdict. Normally, that failure to so move would prevent plaintiff from later moving for a judgment notwithstanding the jury's verdict. But in this case defendants did not challenge in the district court, at the time plaintiff moved for judgment notwithstanding the verdict, plaintiff's failure to move for a directed verdict. Defendants raise on appeal for the first time their claim that plaintiff did not properly comply with the procedural prerequisites to challenging the jury's verdict. It is well settled that issues not raised in the district court are waived on appeal. *DeValk Lincoln*

*Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 338 (7th Cir.1987); *Zbaraz v. Hartigan,* 763 F.2d 1532, 1544 (7th Cir.1985). Consequently we will review plaintiff's arguments on the propriety of the judgment notwithstanding the verdict on the issue of race discrimination.

■ To establish a claim for race discrimination under Title VII or section 1981 plaintiff must show that she was the victim of intentional discrimination. *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 510 (7th Cir.1986). Under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),

> the plaintiff [first] has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted).

■ As for the initial burden of proving a prima facie case of race discrimination we

> explained in a recent decision that the plaintiff can establish a prima facie case of discrimination by demonstrating that he or she is a member of a protected class, that he or she is otherwise similarly situated to members of the unprotected class, and that he or she was treated differently from the members of the unprotected class.

*Ramsey v. American Air Filter Co.,* 772 F.2d 1303, 1307 (7th Cir.1985).

■ Plaintiff is a member of a protected class. She is black. She was the only

black library consultant in the development group. She also was similarly situated with members of the unprotected class—namely, she was a library consultant like the other library consultants in the development group. All the library consultants were supposed to have relatively similar responsibilities and authority. Finally, plaintiff was treated differently from the members of the unprotected class. She was evaluated by Lamont at intervals of three months, six months, twelve months, and eighteen months. Lamont evaluated the other library consultants only annually. Moreover, Lamont's evaluations of plaintiff's performance were negative, whereas previous evaluations by other supervisors had been positive or at least satisfactory. Plaintiff thus established the elements necessary to make out a prima facie case of race discrimination against Lamont.

 Once plaintiff made out her prima facie case of race discrimination the burden shifted to Lamont to articulate some legitimate nondiscriminatory reason for evaluating plaintiff more frequently than the other library consultants and for giving plaintiff negative evaluations. Lamont submits that plaintiff's "sub-par performance, not her race, was the direct and sole cause for her poor and frequent evaluations."

It is not clear from the record why Lamont first evaluated plaintiff after only three months instead of annually. But for whatever reason she did so. That first evaluation rated plaintiff as "needs improvement" in five of nine categories. Lamont wrote in a memorandum attached to the evaluation that plaintiff's "desire to become an effective consultant and her interest in improved library development in

Illinois are important considerations in her work with Library Development." Lamont also indicated that she would evaluate plaintiff on a quarterly basis to monitor plaintiff's progress in the areas in which plaintiff had been evaluated as "needs improvement." Plaintiff responded to this first evaluation by Lamont with a memorandum of her own responding to each of the areas of noted deficiency. Plaintiff specifically retorted: "Ms. Bridget Lamont, has made the evaluation process a humiliating farce!"

Lamont evaluated plaintiff again three months later. Although Lamont indicated that she was "particularly impressed with the work [plaintiff] has done with the Great River Library System," Lamont again rated plaintiff as "needs improvement" in five of nine categories. Lamont attached a two-page memorandum describing how plaintiff could improve her performance and indicating that she would meet with plaintiff weekly to discuss specific assignments. On the basis of this generally unfavorable evaluation Lamont recommended that a satisfactory performance salary increase for plaintiff be withheld.

Although Lamont indicated initially that she would evaluate plaintiff quarterly she did not evaluate plaintiff again for another six months. This third evaluation rated plaintiff as "exceeds expectations" in two categories, "meets expectations" in five categories, and "needs improvement" in only two categories.

Plaintiff's fourth evaluation covered another six-month period of time. Lamont rated plaintiff as "needs improvement" in six of nine categories.[3] This evaluation

---

3. Lamont's evaluation highlighted both positive and negative aspects of plaintiff's work:

Ms. Collins made significant improvements in her work between May–December 1979, but since then there has been a serious decline in her work product. There has been one notable exception, however, with Ms. Collins' work as the Illinois State Library's liaisison [sic] with the ISL Task Force on Library Services to the Aging. Ms. Collins' desire to work with library programs for the disadvantaged and special groups has served as the impetus for development of a survey on Illinois public

library service to the aging. It is important now that Ms. Collins transfer the ideas of the task force and the results of the survey into recommendations for policies and programs in the area. Ms. Collins' enthusiasm about libraries when communicating orally with librarians and trustees is commendable but her problem [is] with written communication; failure to establish logical priorities; difficulties in preparing complete and accurate work; and her consistent tardiness to work and failure to use available time wisely will continue

was signed by Kay Gesterfield, director of the library, in addition to Lamont. The evaluation was jointly prepared by Lamont and Gesterfield because Lamont had been on leave during the time plaintiff's performance was evaluated. Plaintiff filed a labor union grievance on the basis of this evaluation. The grievance was arbitrated in plaintiff's favor and the evaluation was redone.

There is no indication in the record whether or not plaintiff was evaluated for the next seventeen months. But plaintiff then received a fifth evaluation from Gesterfield, instead of Lamont who was on leave, covering a three-month period of time. Gesterfield rated plaintiff as "needs improvement" in five of nine categories. Plaintiff disagreed with Gesterfield's evaluation and wrote in an attached memorandum: "Your appraisal of my performance for this period is unfair and based on racial prejudice and I ask that you withdraw your evaluation."

Three months after this fifth evaluation was completed plaintiff was involuntarily transferred to the reference unit. On this evidence the jury had to decide whether or not Lamont had articulated a legitimate nondiscriminatory reason for evaluating plaintiff more frequently and negatively than the other library consultants in the development group. We believe the evidence was sufficient to allow the jury to conclude that defendants had articulated a nondiscriminatory reason for their actions. As we have pointed out previously:

Once the employer [articulates a legitimate nondiscriminatory reason], the presumption of discrimination "drops from the case," and the plaintiff bears the burden of persuading the trier of fact that the explanation offered by the defendant is pretextual. This [she] may do by showing either that a discriminatory reason more likely motivated the employer, or that the employer's explanation is not worthy of belief. That is, "in the final analysis the trier of fact 'must decide which party's explanation of the employer's motivation it believes.'"

*Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 511 (7th Cir.1986) (citations omitted). In addition to the evaluations and the memoranda attached to them, the jury had other evidence before it. The jury heard conflicting testimony from witnesses familiar with plaintiff's work at the library. For example, Betty Simpson, president of the Illinois Library Board, testified that plaintiff refused to accept her advice and that on one occasion plaintiff's direction of a planning meeting was "absolute disaster." On the other hand, two other witnesses testified that plaintiff did a "good job" as a cataloguer and "did a very good job" on a library committee. Another witness testified that she could find "no fault of [plaintiff's] operation at all" in the way plaintiff coordinated a program for the elderly.

In sum, the jury was presented with evidence on both sides of the issue. It was required to decide whether it believed plaintiff's or Lamont's explanation of Lamont's

to hamper Ms. Collins' desire to become an effective consultant. Ms. Collins needs to concentrate on improving the quality of her work—from the initial concept to the final product—planning for logical priorities and preparing follow-up written reports and recommendations on the programs for which she has responsibility. We need to continue working with Ms. Collins to help productivity and initiative that is expected in the Senior Librarian position however, I believe that Ms. Collins' commitment to libraries could be put to better use in a local community library.

Plaintiff responded to Lamont's observations with comments of her own:

I agree with my supervisor's assessment of my use of time and her statement regarding my tardiness. I have reported to work late repeatedly over the past six months. My excuses were all personal and therefore inexcusable. However, I did discuss the cause with my supervisor. I cannot concur with her evaluation of my overall work performance over this period. I have striven, diligently, to complete all assignments within the time frame given. Admittedly, I didn't meet all of the deadlines, but I tried to do a thorough and complete job on each of the task[s] assigned. I also made a concentrated effort to achieve each of my objectives for this reporting period.

After three years of working in this position in the Library Development Group of the Illinois State Library, I would like to stress the fact that I am not up here trying to goof off. I enjoy my work very much and the people I work with and finally, I am here by choice.

motive for evaluating plaintiff more frequently and more negatively than the other library consultants. Although the jury might have been entitled on this evidence to conclude that Lamont had discriminated against plaintiff on the basis of plaintiff's race,[4] there was substantial evidence that Lamont was not motivated by a discriminatory animus. Rather, the jury was entitled to conclude that Lamont's evaluations were based on plaintiff's poor performance. Consequently, we hold that the district court properly denied plaintiff's motion for judgment notwithstanding the jury's verdict on the issue of race discrimination. *See Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1307 (7th Cir.1985) ("[T]he court rarely will conclude that a district court improperly *refused* to enter judgment notwithstanding the verdict.") (emphasis added).

*B. Retaliation*

■ Plaintiff argued at trial that apart from discriminating against her through the evaluations, Lamont also retaliated against plaintiff by having her transferred to a lesser position as a consequence of plaintiff's filing race discrimination complaints with the EEOC and ILDHR. · The jury agreed with plaintiff. Although the jury found no race discrimination, it did find that Lamont had retaliated against plaintiff by transferring her out of the development group to the reference unit. Defendants challenged this finding at trial

and successfully sought from the district court a judgment notwithstanding the jury's verdict on the retaliation claim.

Plaintiff's first attack on the judgment notwithstanding the jury's verdict is that Rule 50(b) "forbids entry of a judgment notwithstanding the verdict on a motion for such relief not filed within ten days after reception of the *verdict.*" (emphasis added). *Referring to* Fed.R.Civ.P. 50(b). In support of that proposition plaintiff relies on two cases we decided twenty-six years ago. *Nugent v. Yellow Cab Co.*, 295 F.2d 794, 795–96 (7th Cir.), *cert. denied*, 369 U.S. 828, 82 S.Ct. 844, 7 L.Ed.2d 793 (1961); *Hulson v. Atchison, Topeka & Santa Fe Railway*, 289 F.2d 726, 729 (7th Cir.), *cert. denied*, 368 U.S. 835, 82 S.Ct. 61, 7 L.Ed.2d 36 (1961). Both of those cases relied on Rule 50(b) as it was then written.[5] In 1961 the ten-day time period began to run when the verdict was received. In 1987, and for many years prior to 1987, the ten-day period does not begin to run until judgment is entered on the verdict.[6] *See Hahn v. Becker*, 551 F.2d 741, 743 (7th Cir.1977).

The jury rendered its verdict in this case on February 21, 1986. But that did not start the ten-day clock. Defendants orally moved for judgment notwithstanding the jury's verdict immediately after the verdict was announced. Three weeks later defendants reduced their motion to writing on March 13, 1986. Judgment was not entered by the district court until May 2, 1986—long after defendants had moved

---

4. *See, e.g., Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 665–66 (5th Cir.1983) (holding not clearly erroneous district court's finding that defendant employer harassed plaintiff employee by frequent and constant "building of a file which included reports of trivial, petty, insignificant events involving [plaintiff employee]"), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1709, 80 L.Ed.2d 182 (1984); *Few v. Yellow Freight System, Inc.*, No. C84–2478–A, slip op. (N.D.Ohio Apr. 24, 1986) [Available on WESTLAW, DCT database] (finding discrimination where employer instructed supervisor "to start documenting the plaintiff's personnel file whenever a mistake was made by her" because "there was a need to build a file against the plaintiff in order to eventually terminate her employment" and plaintiff's personnel file in fact contained sixteen evaluations completed in the four months prior to termination whereas only eight evalua-

tions had been completed in previous four and one-half years of employment).

5. In 1961 Rule 50(b) read in pertinent part:
 Within 10 days after the *reception of a verdict,* a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict....
 Fed.R.Civ.P. 50(b) (1961) (emphasis added).

6. Today Rule 50(b) reads in pertinent part:
 Not later than 10 days after *entry of judgment,* a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict....
 Fed.R.Civ.P. 50(b) (1987) (emphasis added).

orally and in writing for judgment notwithstanding the jury's verdict. Consequently, plaintiff's argument about the timeliness of defendants' motion for judgment notwithstanding the verdict completely fails.

■ Plaintiff next argues that the district court should have entered judgment on the jury's verdict because there was substantial evidence that defendants had retaliated against plaintiff, as a consequence of plaintiff's filing race discrimination complaints with the EEOC and ILDHR, by transferring plaintiff out of the development group to the reference unit. The relative burdens for proving a retaliation claim parallel those established for proving a race discrimination claim. *See Klein v. Trustees of Indiana University*, 766 F.2d 275, 280–81 (7th Cir.1985). Plaintiff first has the burden of establishing a prima facie case of retaliation. The burden then shifts to defendants to articulate a legitimate nondiscriminatory reason for the challenged action. If defendants make that articulation, the burden shifts back to plaintiff to prove that the defendants' proffered reason is a pretext for an underlying retaliatory reason.

■ As we have explained previously with regard to the first step:

To establish a prima facie case of retaliat[ion], the plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) that there is a causal link between the protected expression and the adverse action. Section 2000e–3 does not require that the challenged employment practice actually violate Title VII; it is sufficient if the

plaintiff has a reasonable belief that there is a Title VII violation.

*Jennings v. Tinley Park Community Consolidated School District No. 146*, 796 F.2d 962, 966–67 (7th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987) (citations omitted).

Plaintiff engaged in statutorily protected expression. She filed complaints with the EEOC and the ILDHR alleging race discrimination on the basis of her frequent and negative evaluations. Based on plaintiff's educational background, former work experience, favorable or satisfactory evaluations from other supervisors, and the fact that she was the only black library consultant in the development group, plaintiff had reason to believe her complaints of race discrimination were well founded, irrespective of the ultimate disposition of those complaints.

■ Plaintiff also suffered an adverse action at the hands of defendants. Although the district court did not discuss this element in its written order, defendants argue at length that plaintiff's transfer from the development group to the reference unit was not an adverse job action. They argue that "where an employee is laterally transferred to a position of equal stature, resulting in no loss of pay or benefits, no adverse job action is present." Defendants cite the testimony of the director of affirmative action, Rolando, that the transfer indeed was lateral and was not a demotion in any respect. However, our own research disclosed that, contrary to defendants' assertion, several courts have found an adverse job action, for purposes of discrimination or retaliation, in a lateral transfer even where the transfer did not result in a reduction of pay or benefits.[7]

7. *E.g., Rodriguez v. Board of Education*, 620 F.2d 362, 364–66 (2d Cir.1980) (holding adverse job action established where "severe professional ... trauma" resulted from difference in "the site of [teacher's] work and the age of her pupils" even though the transfer "does not and will not diminish [teacher's] salary; does not and will not reduce her benefits, her seniority rights, or add any increased load to her work performance"); *Jacobs v. Martin Sweets Co.*, 550 F.2d 364, 367, 368, 369 n. 9 (6th Cir.1977) (holding that even though job transfer involved "no change in hours and no reduction in salary" and

plaintiff "had not at all times been diligent and punctual in attendance" transfer from position as executive secretary to senior vice president to "just a clerical position" in the purchasing department was adverse job action); *Goodwin v. Circuit Court*, 729 F.2d 541, 550 (8th Cir.1984) (holding adverse job action, supporting section 1983 claim of sex discrimination, demonstrated where hearing officer in juvenile court was involuntarily "transferred, without any reduction in pay or benefits, to a permanent position on the legal staff" of the court), *aff'd on second ground*, 741 F.2d 1087 (8th Cir.1984), *cert. de-*

Title VII does not limit adverse job action to strictly monetary considerations. One does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture. In a sex discrimination case focusing on the issue of adverse job action the Second Circuit pointed out:

> Recognizing that job discrimination may take many forms, Congress cast the prohibition of Title VII broadly to include subtle distinctions in the terms and conditions of employment as well as gross salary differentials based on forbidden classifications. In the instant case the district court dismissed the sex discrimination suit of a junior high school art teacher who was transferred to an elementary school in the same system, al-

legedly on the basis of sex, essentially because the transfer entailed no loss of salary or other monetary benefits. We reverse.

*Rodriguez v. Board of Education,* 620 F.2d 362, 364 (2d Cir.1980). We believe adverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well. For example, other courts have found adverse job impact, where there was no reduction in salary or benefits, in an employer's moving an employee's office to an undesirable location,[8] transferring an employee to an isolated corner of the workplace,[9] and requiring an employee to relocate her personal files while forbidding her to use the firm's stationary and support services.[10]

*nied,* 469 U.S. 1216, 105 S.Ct. 1194, 84 L.Ed.2d 339 (1985); *St. John v. Employment Development Department,* 642 F.2d 273, 274 (9th Cir. 1981) (holding adverse job action demonstrated based on district court's finding that transfer of employee from state EEOC office "to another job of the same pay and status constitutes retaliation for her filing of a complaint with" the federal EEOC); *Ferguson v. E.I. duPont de Nemours & Co.,* 560 F.Supp. 1172, 1183, 1201 (D.Del. 1983) (holding that where secretary to business executive was *temporarily* transferred to secretarial pool and "[h]er salary level and other employee benefits were unchanged," no adverse job action demonstrated, but also noting that "[h]ad she been *permanently* reassigned ... this element [of adversity] would be established"); *see also Trout v. Hidalgo,* 517 F.Supp. 873, 891 (D.D.C.1981) ("Ms. Perlingiero's evaluations were favorable until she filed her EEO complaints; she was thereafter given the lowest possible rating and then transferred to a department in which she had no background,"—court holding adverse job action established in retaliatory transfer that implicitly did not reduce salary or benefits), *aff'd in part and rev'd in part sub nom. Trout v. Lehman,* 702 F.2d 1094 (D.C. Cir.1983), *vacated on other grounds,* 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984); *Burkey v. Marshall County Board of Education,* 513 F.Supp. 1084, 1092–93 (N.D.W.Va.1981) (holding adverse job action supporting retaliation claim established where teacher, who also coached athletic teams, was involuntarily transferred from junior high school where she had taught for six years to an elementary school with no athletic program—although no specific finding that pay or benefits remained constant, finding was implicit in district court's analysis); *Harris v. Richards Manufacturing Co.,* 511 F.Supp. 1193, 1203 (W.D.Tenn.1981) (holding

adverse job action demonstrated where plaintiff was permanently transferred from "highly technical and skilled job" to an "unskilled" job "in an isolated area of the plant" sufficient to support retaliation claim—court implicitly finding no reduction of pay or benefits), *aff'd in part and rev'd in part,* 675 F.2d 811 (6th Cir.1982).

8. *Trout v. Hidalgo,* 517 F.Supp. 873, 890 n. 67 (D.D.C.1981) ("Among other discriminatory actions taken against Ms. Bach [was] ... the removal of her office to an undesirable location...."), *aff'd in part and rev'd in part sub nom. Trout v. Lehman,* 702 F.2d 1094 (D.C.Cir. 1983), *vacated on other grounds,* 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984).

9. *Harris v. Richards Manufacturing Co.,* 511 F.Supp. 1193, 1203 (W.D.Tenn.1981) ("[T]he present plaintiff was shunted off to an isolated corner in retaliation for her filing of [race] discrimination complaints against the company. The transfer was not temporary but appeared to be permanent, and was [to] ... an isolated area of the plant."), *aff'd in part and rev'd in part,* 675 F.2d 811 (6th Cir.1982).

10. *Commonwealth v. Thorp, Reed & Armstrong,* 25 Pa.Commw. 295, 361 A.2d 497, 502 (1976) (holding in sex and age discrimination case, based on state statute similar to Title VII, that law firm retaliated against associate, who filed discrimination complaint, when associate was "directed to relocate her personal files to some other facility" and "directed to refrain from using the firm stationery" and "she lost the use of office space and the services of a secretary and a messenger as well as the use of the firm library and of various copying and other office machines").

**704**

Plaintiff sufficiently established adverse job action here. She was transferred away from a job she enjoyed. She was placed in a new department. Her supervisors seemed unsure of what plaintiff's responsibility and authority would be at the newly created job. Plaintiff was relegated to doing reference work instead of consulting. Plaintiff previously had her own office, a telephone at her desk, printed business cards, and listings in professional publications as a library consultant. After her transfer plaintiff was placed at a desk out in the open. She did not have her own office. Her desk was situated just outside her supervisor's office where a receptionist's desk typically would be located. Plaintiff had no telephone at her desk with which she could conduct her business responsibilities. She was not allowed to have business cards printed and she was no longer listed in professional publications as a library consultant. This evidence amply demonstrated an adverse job action.

 The final element of a prima facie retaliation claim is the demonstration of a causal link between plaintiff's protected expression (the filing of race discrimination complaints with the EEOC and the ILDHR) and the adverse job action (the transfer from the development group to the reference unit). The district court granted defendants' motion for judgment notwithstanding the jury's verdict expressly because it believed that plaintiff failed to prove this causal link, holding that "[t]he only evidence in favor of the verdict is the coincidence in time." [11] In other words, the

district court believed that the jury had incorrectly found retaliation because there was insubstantial evidence, perhaps not even a scintilla of evidence, that the transfer of plaintiff from the development group to the reference unit was causally connected to plaintiff's filing of race discrimination complaints with the EEOC and the ILDHR.

Perhaps if we or the district court were making the factual decision in the first instance whether or not plaintiff's transfer, so shortly after she filed race discrimination complaints, was merely coincidental, we might conclude that it was. But neither we nor the district court sits as factfinder in this case. Our function is not to find the facts, but rather to decide if substantial evidence, rather than a mere scintilla of evidence, of a causal connection between the filing of the complaints and plaintiff's transfer was presented to the jury.

Lamont became the supervisor of the development group in October 1978. Although she gave plaintiff frequent and consistently poor evaluations, nothing in the record indicates that Lamont ever attempted to have plaintiff transferred out of the development group. Indeed, plaintiff worked in the development group under Lamont's supervision from October 1978 until December 1981, a period of over two years, without any efforts by Lamont to have plaintiff transferred. Then in December 1981, however, plaintiff filed grievances with her labor union against Lamont based in part on the evaluation Lamont had signed for a period of time during which Lamont was on leave. Events then began

---

11. The district court's entire analysis of plaintiff's retaliation claim is set out below:

On the retaliation charge, no persuasive evidence—aside from the coincidence that the transfer took place after the filing of the discrimination charge—was produced, nor was any evidence that would rebut Defendant's reasons for the transfer. Thus, the Defendant's motion for a judgment n.o.v. is allowed because we must find that: (1) there was *no* substantial evidence to support the jury verdict of retaliation; (2) that the evidence of retaliation combined with all reasonable inferences to be drawn from it, are *insufficient*, "viewed in the light *most favorable* to the party winning the verdict;" and (3) that there is not enough evidence to support the verdict

because there is only "a mere scintilla," if any, evidence in Plaintiff's favor—not enough to withstand a motion for judgment n.o.v. *See LaMontague* [sic] at 1410. The only evidence in favor of the verdict is the coincidence in time. The evidence in favor of Defendant against the retaliation verdict is the existence of the low job evaluations and testimony of Plaintiff's superiors to which Plaintiff can only offer testimony of employees who did not work directly over, with, or under Plaintiff. Thus, Defendant's motion for judgment n.o.v. is proper.

*Collins v. Lamont,* No. 83–3167 (C.D.Ill. Apr. 7, 1986) (order ruling on motions for judgment notwithstanding the verdict) (emphasis in original).

to move rapidly. Although the record does not show whether plaintiff had received any evaluations for the previous seventeen months, she was immediately evaluated by Gesterfield, the director of the library, for the three-month interval following plaintiff's filing of grievances with the labor union. This evaluation covered the time period from December 1981 to March 1982. Gesterfield's evaluation rated plaintiff's performance as "needs improvement" in five of nine categories. The next month, in April 1982, Lamont had a law firm, on her behalf, send a letter to plaintiff's labor union, a copy of which was sent to plaintiff, threatening to sue plaintiff if plaintiff's labor union grievances were unsuccessful. *See Stebbins v. Nationwide Mutual Insurance Co.*, 1972 Empl. Prac. Dec. (CCH) ¶ 7576, 5303 (E.D.Va.1971) (holding retaliation established where employer wrote letter to complaining prospective employee that accused prospective employee of destroying mutual confidence necessary to employment relation by bringing unfounded discrimination charges), *aff'd on other grounds*, 469 F.2d 268 (4th Cir.1972), *cert. denied*, 410 U.S. 939, 93 S.Ct. 1403, 35 L.Ed.2d 606 (1973). Plaintiff responded to the letter the following month, in May 1982, by filing an additional labor union grievance and by filing race discrimination complaints with the EEOC and the ILDHR. The Illinois affirmative action office began its investigation of plaintiff's complaints shortly thereafter on June 1, 1982. An affirmative action officer wrote a memorandum about the investigation to her supervisor, Rolando, and carbon copied the memorandum to Lamont and Gesterfield. Within days of the issuance of the memorandum Lamont contacted Rolando about the possibility of having plaintiff transferred out of the development group. By the first week of July 1982 Lamont, Rolando, and Gesterfield had decided to transfer plaintiff out of the development group to a newly created position in the reference unit. By mid-July the transfer was accomplished.

We do not believe these events, when considered in light of their rapidity and proximity in time to plaintiff's filing of the grievances and complaints and when considered against the background of plaintiff's uninterrupted two-year tenure in the development group, can be said to be a mere scintilla of evidence showing a causal connection between plaintiff's lawful actions and defendants' transfer of plaintiff. Rather, we believe substantial evidence of the causal connection was demonstrated. Consequently, we conclude plaintiff established her prima facie case of retaliation.

Once plaintiff established this prima facie case of retaliation the burden shifted to defendants to articulate a legitimate non-discriminatory reason for plaintiff's transfer so shortly after plaintiff had filed her grievances and complaints against Lamont. Defendants first argue that the affirmative action officer's memorandum did not name Lamont by name and that Lamont was not sure when she eventually became aware that the complaint was directed against her. Second, defendants succinctly contend: "The reason for the more than annual evaluations and the reason for the transfer were simply the result of [plaintiff's] poor job performance." Defendants also argue: "Lateral transfers are a common management tool utilized to best harmonize the needs of the employer with the skills of the employee, to the benefit of both. A lateral transfer, for legitimate reasons, is not an act of punishment." These articulations were sufficient to shift the burden back to plaintiff to show that defendants' proffered reasons were merely pretextual.

Plaintiff's evidence offered to establish her prima facie case of retaliation also was applied to show that defendants' explanations were pretextual. The jury was thus presented with the question of whether plaintiff's transfer was a consequence of her filing grievances and complaints against defendants or whether the timing of the transfer was merely coincidental and the transfer was in fact motivated by legitimate management reasons. Although the jury might have been entitled to decide otherwise, the jury was entitled to find retaliation because we believe there was substantial evidence of retaliation. It certainly was more than a scintilla. As a

706

result, we hold that the district court should have entered judgment on the jury's verdict and not entered judgment notwithstanding the verdict. *See McKinley v. Trattles*, 732 F.2d 1320, 1324 (7th Cir.1984) (noting that the standard for reviewing a judgment notwithstanding the verdict "is a demanding standard and, under it, there would perhaps not be many cases in which we could conclude that a jury behaved irrationally").

### III. CONCLUSION

In sum, we hold that the district court properly denied plaintiff's motion for judgment notwithstanding the verdict on the issue of race discrimination. We also hold, however, that the district court improperly granted defendants' motion for judgment notwithstanding the verdict on the issue of retaliation. Because the trial was bifurcated the jury decided the issue of liability only; it did not award damages, if any, to plaintiff on her successful claim of retaliation. Therefore, we remand the case, without applying Seventh Circuit Rule 36, for the determination of damages, if any, on the retaliation claim. The parties shall bear their own costs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.