Yvonne G. TROUT, et al., Plaintiffs,

v.

Sean O'KEEFE, et al., Defendants.

Civ. A. No. 73–0055 (HHG).

United States District Court,
District of Columbia.

Nov. 12, 1992.

Bradley G. McDonald, John F. Karl, Jr., McDonald & Karl, Washington, D.C., for plaintiffs.

Thomas S. Rees, Asst. U.S. Atty., Washington, D.C., (Matthew J. Wheeler, Karen McCoy, Richard D. Hipple, Daniel E. O'Connell, Jr., Attys., Office of the Gen. Counsel, U.S. Dept. of the Navy, of counsel), for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

Pending before the Court is plaintiff's motion for an extension of the backpay award from May 1979 through the present. Also pending are the responses to the Court's order to show cause why Rule 11 sanctions should not be imposed on an Assistant United States Attorney who represented the defendants and on then-Secretary of the Navy H. Lawrence Garrett III as the represented party in this litigation based on defendants' memorandum of September 20, 1990, which the Court found to be *prima facie* frivolous. Pursuant to the Court's Show Cause Order, the respondents filed lengthy memoranda and supporting affidavits. After consideration of the filings, the record, and the Court's familiarity with this litigation, it finds that defendants' memorandum of September 20, 1990 was not grounded in fact and was imposed for the improper purpose of delay and harassment of the plaintiffs. Nonetheless, the Court has concluded reluctantly, that for the reasons stated below, sanctions should not be imposed under the circumstances of this case. By contrast, the Court finds that plaintiffs' motion for an extension of backpay through the present is meritorious.

The motion for backpay and the Show Cause Order rest on the common ground of the government's strategy of attrition against the Navy women. Thus, in order to render understandable the nature of the case and today's ruling, the Court will once again briefly recapitulate the history of the litigation, the September 20, 1990 pleading at issue, and, finally, the circumstances underlying the plaintiffs' motion for backpay.

## I

### Context of the Litigation

■ The Court's Show Cause Order derives most directly from the Memorandum of September 20, 1990. However, the issue of the frivolousness of a filing usually cannot be viewed in a vacuum, but the full context must be considered. Moreover, under Rule 11 the Court must be cognizant of the circumstances surrounding the sanctionable conduct, *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1177 (D.C.Cir.1985), and convey a sense of the litigation's flavor. *Id.* at 1174.

After almost twenty years of litigation, this case still "drags its weary length before the Court"[1] because the tactics of the Navy and its Justice Department counsel have been as indefatigable as they have often been entirely inappropriate.

Following an administrative complaint in 1972, several judicial complaints charging sex discrimination by the Department of the Navy in violation of Title VII of the Civil Rights Act of 1964 were filed in this Court.[2] The Court consolidated the complaints, and it certified a class of plaintiffs consisting of civilian women employees who between June 6, 1972 and June 4, 1979 worked for an agency of the Department of the Navy originally called NAVCOSSACT[3] and later NARDAC,[4] the Navy's computer operations center. At a two-week trial, forty-two witnesses were heard, and over 7,500 pages of exhibits were admitted. The Court ultimately decided that plaintiffs had proved discrimination by the Navy against the class in violation of Title VII. *Trout v. Hidalgo*, 517 F.Supp. 873 (D.D.C. 1981).

The Court of Appeals affirmed the Court's finding of class-wide discrimination in promotions, but reversed some other findings based on the parties' statistical

---

1. C. Dickens, *Bleak House* 13 (1853).

2. The Act was amended in 1972 by the Equal Employment Opportunity Act. 42 U.S.C. §§ 2000e to 2000e–17.

3. Naval Command Systems Support Activity.

4. Navy Regional Data Automation Center.

evidence. *Trout v. Lehman,* 702 F.2d 1094, 1103–05 (D.C.Cir.1983). At that stage of the litigation, nearly ten years ago, the Court of Appeals criticized even then the Navy's efforts to reopen settled issues. The court admonished:

> At some point litigation must come to an end, even though it is always possible to offer more evidence. ... [W]e find it extremely troublesome—in light of the long and complex history of this litigation and in light of Judge Greene's patient and thoughtful treatment of the case—that the [government] would even propose that the trial court reopen and retry the matter. In the context of this case setting, such an adversarial tactic is irresponsible, insensitive to the extraordinary burdens faced by district courts already overloaded with heavy dockets, and wasteful of precious resources of litigants and the judiciary.

*Id.* at 1106. The court concluded that the Navy's tactics were "an affront to the judicial system." *Id.* at 1107.

Unfazed by the ire of the Circuit panel, the Navy sought rehearing *en banc.* When rehearing was denied, the Navy petitioned the Supreme Court for *certiorari* seeking summary reversal of the Court of Appeals and the District Court. The Supreme Court vacated the finding of class-wide discrimination and remanded the case. Justice Stevens, in a dissent joined by Justices Brennan and Marshall, *inter alia* observed with lamentable prescience:

> The Court's action today encourages the kind of litigating strategy that gives the party with greater resources a significant advantage unrelated to the merits of the case.

*Lehman v. Trout,* 465 U.S. 1056, 1061–1062 n. 8, 104 S.Ct. 1404, 1407–1408 n. 8, 79 L.Ed.2d 732 (1984) (Stevens, J., dissenting).

On remand, this Court, following appropriate proceedings in conformity with the appellate decisions, again determined that the Navy was guilty of sex discrimination and liable to the plaintiff class. *Trout v. Lehman,* 652 F.Supp. 144 (D.D.C.1986).

The Court further ruled, in accordance with the Navy's request, that individual hearings would be held for the class members in order to determine their entitlement to relief. *Trout v. Webb,* 708 F.Supp. 358 (D.D.C.1988). The individual claims were referred to a Special Master pursuant to Rule 53(b) of the Federal Rules of Civil Procedure due to the number of claims and their complex nature.

Proofs of Claim were filed on behalf of ninety-three claimants. Notwithstanding the decisions of this Court finding discrimination against the class, *the government opposed all but five of these ninety-three claims* [5] on the basis that the individuals had not been discriminated against. The effect of the Navy's action was to require the eighty-eight remaining individuals to prove discrimination all over again, although, as a matter of law, once a finding of discrimination has been made in favor of the class, individual class members need to make only a minimal showing to be entitled to relief, *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 259 (5th Cir.1974); *Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437, 445 (5th Cir.), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974), and a finding in favor of a class is therefore normally accepted by defendants in Title VII litigation with respect to all or all but a few of the class members.

Following briefing and argument, the Special Master ruled on January 11, 1990 that thirty-two members of the class were entitled to summary judgment on the issue of entitlement to relief pursuant to *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 361–62, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977), a ruling that included summary judgment to the five class members whose claims were not contested by the Navy; summary judgment was granted in favor of the Navy in sixteen cases where the claimants could not satisfy the initial burden imposed by *Teamsters* or where the Navy successfully rebutted the plaintiffs' claim; and ten

---

**5.** Even as to these five claimants, the government subsequently attempted to renege on its concession. This is the subject of the Court's Show Cause Order. *See* Section II, *infra.*

cases were dismissed where the claimants were found to have opted out of the class. Due to factual disputes and ambiguities, the issue of entitlement to relief of the remaining thirty-five class members was set by the Special Master for individual evidentiary hearings. Just as the evidentiary hearings were due to begin, the Navy stated that it would not contest the entitlement to relief of these thirty-five class members; however, it continued to challenge the prevailing thirty-two claimants.

The casual reader will find it odd that the Navy would concede the thirty-five cases of individuals who did not prevail on summary judgment and whose cases required evidentiary hearings, but would continue to oppose the thirty-two claimants whose claims did prevail on summary judgment and therefore presumably were stronger. As this Court has previously noted, *see Trout v. Garrett*, 780 F.Supp. 1396, 1423, (D.D.C. 1991), the Navy's peculiar legal strategy may be explained by the fact that the thirty-five claimants with the presumably weaker claims were represented Covington & Burling and the Lawyers Committee for Civil Rights. The government, undoubtedly believing that it could not wear out the large Washington law firm and the public interest group, settled those claims. But the Navy and its Justice counsel took a different and more hostile tack with respect to the smaller firm that had handled the class action, most of the time without receiving any payment.

At the subsequent relief proceedings before the Special Master, the government spent over $2 million in expert witness fees alone (in addition to vast sums spent in the preceding seventeen years for attorneys' salaries and witness fees) to win a case that was worth a fraction of that amount. The government contested every conceivable point, even exhuming issues that had long since been settled. Even where the purpose of the hearings was simply to cal-culate what backpay was appropriate recompense for particular class members, the government and its expert insisted that there never had been any discrimination. They took such a position in spite of the fact that this Court had by then twice determined that such discrimination had existed.

The Navy's tactics on the issue of interim attorneys' fees also provides a microcosm of its litigation strategy of attrition—an effort both to delay the litigation and to drive up its costs. The Navy and its counsel adamantly opposed a 1987 request by plaintiffs' counsel for interim attorneys' fees—hardly an unreasonable request after many years of litigation, the expenditure of a vast amount of funds, and an entirely favorable outcome to plaintiffs with respect to the class litigation. *See Brown v. Marsh*, 707 F.Supp. 21, 23 (D.D.C.1989); *McKenzie v. Kennickell*, 669 F.Supp. 529, 535 (D.D.C.1987); *Jurgens v. EEOC*, 660 F.Supp. 1097, 1100–01 (N.D.Tex.1987). When the government's opposition was rejected by this Court, *Trout v. Lehman, supra*, 702 F.2d at 3, the Navy and its counsel commenced a further round of litigation on the issue of attorneys' fees, and only when they had exhausted all avenues of ordinary and extraordinary review [6] were the fees paid in 1989, over two years after they had been sought by plaintiffs.

As this Court has observed repeatedly, "the government has sought to prolong this litigation by every means possible, both fair and foul." *Trout v. Garrett*, 780 F.Supp. 1396, 1421 (D.D.C.1991). The conduct heretofore described is not directly the subject of sanctions, but it certainly cannot be ignored. The conduct of the Navy and its counsel provide a backdrop for the Court's examination, and the government's current arguments must be viewed in the context of its general overzealous strategy.

---

**6.** Government counsel opposed plaintiffs' request and sought extensive discovery. On August 5, 1988, this Court directed the Navy to pay $291,478.01 in interim attorneys' fees and costs. 702 F.Supp. 3. The Navy appealed the order but the Court of Appeals dismissed the appeal

(*Trout v. Ball*, No. 88–5264 (D.C.Cir. March 30, 1989). The Navy then moved for rehearing *en banc* and petitioned for a writ of mandamus. The Court of Appeals dismissed the appeal, and denied the mandamus petition in 1989. *Trout v. Garrett*, 891 F.2d 332 (D.C.Cir.1989).

## II

### *Memorandum of September 20, 1990*

As noted above, despite the Court's finding of class-wide discrimination, the Navy and Justice counsel chose to contest nearly every individual claim. However, there were five claims they did not contest.[7] On March 22, 1989, Justice counsel filed a memorandum in this case on behalf of the Navy in which they described these five claims as "undisputed," and announced their intention "not to contest" them. Defendants' Response to the Class Members Proof of Claim Forms at 1 (March 22, 1989). If there was any doubt about the meaning of the March 22 memorandum, it was dispelled by a number of other filings entitled, for example, "Defendants' Determination to Retroactively Promote Ms. Claire Chong," wherein it is stated that "NARDAC has decided to retroactively promote Ms. Chong based upon her Qualifications," *see* Defendants' Objections Regarding the Retroactive Promotion (October 25, 1990) at 6, and similar memoranda regarding claimants Tolliver, Broughton, Haywood, and Velvin.[8]

Plaintiffs thereafter filed for summary judgment with respect to these five and other claimants, and Navy–Justice counsel again responded that they would not contest these five claims. Defendants' Cross Motion for Summary Judgment (July 17, 1989) at 23.[9] The Special Master consequently granted summary judgment to these five plaintiffs. Government counsel thereafter continued to file objections to nearly every adverse ruling of the Special Master—except to the grant of summary judgment to the five uncontested claims. Indeed, on April 24, 1990, counsel represented that these claimants would be promoted as of specific dates as follows:

| Claimant | Grade Level to Which Claimant is to be Promoted | Proposed Date of Promotion |
|---|---|---|
| Marie Broughton | 13 | August 18, 1976 |
| Claire Chong | 13 | June 6, 1972 |
| Faye Tolliver | 13 | November 20, 1977 |
| Carole Velvin | 13 | October 23, 1977 |
| Carolyn M. Harwood | 14 | April 8, 1979 |

Notwithstanding this history of concessions, representations, and commitments, Justice counsel filed on September 20, 1990, eighteen months after the first concession, what was labelled a "Statement Regarding the Status of Backpay Claims for [the Five Claimants]." In that filing, counsel informed the Special Master and the plaintiffs that, contrary to all the previous representations, not only had the promotions not taken place, but the Navy would not promote these five women at all until it had fully exhausted its claimed right to appeal the question of liability for

7. These five claims are those of Marie M. (Lassiter) Broughton, Claire C. Chong, Carolyn M. Harwood, Faye B. Tolliver, and Carole A. Velvin.

8. The Broughton memorandum states that the Navy would not contest the case because it was not "winnable under the clear and convincing standard." *Id.*

9. In a section entitled "Relief Should be Limited to the Four GS–13 and One GS–14 Position," counsel stated:

   In recognition of the clear and convincing evidentiary standard imposed upon defendants at the individual relief hearings, defendants have stated that five additional promotions of females would have been appropriate during the period of March 1972 to June 1979

   . . . .

   Thus, defendants contend that this make whole relief, should be limited to Ms. Marie Lassiter Broughton, Ms. Claire Chong, Ms. Carolyn Harwood, Ms. Faye B. Tolliver, and Ms. Carole Velvin. . . .

   Defendants' Cross–Motion for Summary Judgment at 23 (July 17, 1989).

discrimination of the entire class. *Id.* at 6.[10] Before this Court, the Navy–Justice team has taken the same position. Defendants' Objections Regarding Retroactive Promotions (October 25, 1990).

At the time, the only explanation given for this about-face was the statement of Justice Department counsel that their papers were poorly drafted, and "unfortunately conveyed the distinct impression that these promotions were an accomplished fact, rather than part of the unitary position above described which, if accepted, would have resolved the issue of relief, subject to defendants' right to appeal the finding of liability." Defendants' Objections to the Memorandum and Order of the Special Master Regarding Retroactive Promotions and Back Pay for Five Uncontested Claimants at 5–6 (October 25, 1990).

In its Opinion of November 27, 1991 the Court concluded that the Memorandum of September 20 and the novel so-called "unitary position" that it advanced after the fact constituted a *prima facie* violation of Rule 11. *See Trout v. Garrett,* 780 F.Supp. 1396, 1426–29 (D.D.C.1991). Accordingly, the Court issued an Order to Show Cause Why Rule 11 sanctions should not be imposed as to the Assistant United States Attorney who signed the paper in question, Thomas S. Rees,[11] and the represented party, then-Secretary of the Navy H. Lawrence Garrett III. *Trout v. Garrett, supra,* 780 F.Supp. at 1429–30.

In answer to the Order to Show Cause, respondents Rees and Garrett argue in the main that defendants and counsel for the government had always clung to the so-called "unitary position" although they did not articulate it as such until the September 20th filing and a hearing just prior thereto. Respondents contend that, while they understood that no one other than themselves knew of the unitary position, the filing in question was an effort to "clarify" what their position was and had been. Throughout, the government contends that it acted with subjective good faith.

Respondents first direct the Court's attention to a hearing before Special Master Lawrence Speiser[12] on August 23, 1990, just prior to the September 20th filing in question. At the hearing the Special Master demanded to know why the five women who were given retroactive promotions had not been paid. The Special Master concluded, "There has been [a] determination to retroactively promote them, as I understand it. Isn't that correct, Mr. Rees?." Transcript of Hearing of August 23, 1990 (hereinafter Tr.) at 339.

The transcript then reflects a pause during which, respondents explain, Mr. Rees consulted at length with counsel from the U.S. Attorney's Office and the Department of the Navy. Mr. Rees, who had apparently taken over the *Trout* case no more than two months previously, then articulated for the first time the unitary position to the Special Master: he explained that the promotions of the five women were contingent upon a finding of final liability. Tr. at 339–40. As respondents note with a flair for understatement, "The Special Master voiced a different understanding of defendants' position." Response to Show Cause Order at 5. Consequently, the Special Master ordered defendants to file in writing an explanation of the status of the five women.

The mere fact that respondents enunciated their "unitary position" at a hearing just prior to the September 20th Memorandum does not alter the fact that the Memoran-

---

10. Government counsel, without any embarrassment regarding the belated change of position, stated that all along they had argued a "unitary position" in which the promotion of the five claimants was subject to an ultimate determination that the Court's liability determination was correct "following entry of final judgment in this case and exhaustion of any appeals that might be taken." Defendants' Statement Regarding the Status of Backpay Claims for [the Five Claimants] at 6 (September 20, 1990).

11. The paper in question was signed only by Mr. Rees, although the names of Jay Stephens, the United States Attorney, and Assistant United States Attorney John D. Bates were also "signed" presumably by Mr. Rees. *See Trout v. Garrett,* 780 F.Supp. 1396, 1428 (D.D.C.1991).

12. Mr. Speiser was appointed pursuant to Fed. R.Civ.P. 53(b). *See Trout v. Garrett, supra,* at 1401 n. 6, and accompanying text.

dum, or the position taken at the hearing on August 23, constituted a fundamental change in position. It is clear from the record, even with respondents' attempt to minimize it, that the Special Master regarded the Navy's position as a new one.

Respondents point to its papers that predate the hearing and the Memorandum of September 20. For example, they note the filings from March 1989 regarding the five claimants in which it was stated that the Navy would promote the five women "without in any way conceding liability" and elsewhere that it would promote the five women "without admitting fault." Response to Show Cause Order at 9. Respondents then observe that the phrase "without admitting fault" was drafted by counsel from the Department of the Navy. Justice Department counsel, however, changed the phrase to "without conceding liability" because counsel "intended the change to confirm defendants' intent" to reserve its right to appeal liability. Response to Show Cause Order at 9 n. 4. Counsel did not, however, even at that time change the phrase in all the pleadings. *Id.* Ironically, even this effort which respondents point to as exculpatory, was inadequate, for the government, in other papers, has conceded that its papers, including those reviewed by the U.S. Attorney's Office, were "poorly drafted," not "carefully prepared," and generally unclear.[13] *Trout v. Garrett, supra,* 780 F.Supp. at 1427. In addition, respondents emphasize, as they do repeatedly, emphasize their subjective "intent." *See, e.g.,* Response to Show Cause Order at 9 n. 4, 11, 16.

The respondents take the Court on a tour of the behind-the-scenes decision-making process of the Office of the U.S. Attorney and the Department of the Navy to establish the subjective good faith of Justice and Navy counsel that they were not changing their position. Respondents note that great time and effort was involved in the disputed Memorandum of September 20. Response to Show Cause Order at 17. Two Navy attorneys, Karen McCoy and Richard Hipple, were initially assigned to drafting the Memorandum. The Navy attorneys reviewed the defendants' prior memoranda and concluded that "defendants' intent was not well conveyed and that the responses were inartfully drafted." *Id.*

At the same time, respondents explain, meetings were held in the U.S. Attorney's Office to "determine whether, inadvertently, we had misinformed the Special Master" regarding the defendants' position. *Id.* at 18. Navy counsel McCoy and Hipple, and C. John Turnquist, Associate General Counsel for Litigation at the Navy, met with their U.S. Attorney counterparts and concluded that "notwithstanding the unclear language" in the previous papers, "not a single person involved in the process of responding to the Special Master's directive considered the position of defendants regarding the five claimants to have changed...." *Id.* at 19. Counsel acknowledged that the Navy's language had been "unclear" and "poorly drafted" and that therefore respondents would bluntly assert their position but, for strategic reasons, strike an apologetic tone. *See id.* at 19–20.

Through various avenues, respondents concede, as they surely must, that no one but they knew there was a "unitary position." Conceding the faulty and opaque quality of their papers, they point to isolated words they deem significant in their papers and argue that government counsel did not believe their position to have changed. Respondents can only point to code words and private meetings and emphasize again and again their subjective intent. Under Rule 11, even if this is true, it is not enough.

### III

#### *Violation of Rule 11*

Fed.R.Civ.P. 11 reads as follows:

The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best

---

**13.** Respondents continue to concede that their papers were unclear and poorly drafted, but "for the Court's guidance ... point to language deemed significant by the drafters of the pleadings." Response to Show Cause Order at 11 n. 5.

of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

■ First. Rule 11 is to be read objectively. *Business Guides, Inc. v. Chromatic Communications Enters. Inc.*, 498 U.S. 533, 540–41, 111 S.Ct. 922, 932–35, 112 L.Ed.2d 1140 (1991); *Westmoreland v. CBS*, 770 F.2d 1168, 1177 (D.C.Cir.1985). To be sanctionable, conduct need not be in subjective bad faith. *Business Guides, supra*, 498 U.S. at 540, 111 S.Ct. at 932. Rather, the objective standard should be viewed in light of the surrounding circumstances. *Id.* at 540, 111 S.Ct. at 933.

Although, as noted, respondents go to great lengths to emphasize that they lacked subjective bad faith, their efforts only underscore that by any objective measure they contravened Rule 11. Respondents are quite clear about the fact that they realized that no one was aware of their unitary position and that the Memorandum of September 20 would appear to all to be a change in their position. Thus, even in the mind of defense counsel, there was no objective basis for the "unitary position" articulated in the Memorandum. As this Court has noted, "if it was the 'poor drafting' of counsel that gave the plaintiffs, the Special Master, and the Court a certain 'distinct impression,' it is counsel and those they represent who must accommodate the result." *Trout v. Garrett, supra*, 780 F.Supp. at 1427.

Once defendants articulated one position—that the five claimants would be promoted—and the government concedes that its papers created that impression, a repudiation of that position well over a year later constitutes a change in position, and a misleading of the opposition and the courts, regardless of whether the government had secretly meant something else all along.

Second. Even assuming, *arguendo*, that respondents are to be viewed under a subjective standard, there is no factual or logical basis for the Memorandum in question. In its papers defendants have emphasized that the five women were being promoted because their qualifications were outstanding. Yet, in its Memorandum of September 20 and subsequently, defendants claim that these promotions were dependent on an ultimate appellate endorsement of the findings of liability. This is inherently inconsistent.

If these women were qualified for promotions that they did not receive, then they ought to have been promoted regardless of whether the Navy was liable for discrimination to the class generally. In other words, the government's acknowledgement that these five women were well qualified is necessarily a concession as to them. The Navy cannot concede that these five women were outstanding candidates and should have been promoted but then make their promotion contingent on an ultimate finding that it was not liable as to others.

Third. It must be noted that the government previously defended the "unitary position" by arguing that it could not be estopped from redefining its position. *See Trout v. Garrett, supra*, 780 F.Supp. at 1425. The Court rejected that line of argument as inapplicable. *Id.* at 1425–26. Interestingly, the government has abandoned its estoppel argument and now makes no mention of its previous assertions that it was free to change its position.

The Court finds that the Memorandum of September 20, 1990 lacked any basis in fact and was imposed for the improper purpose of delay and harassment. Respondents have acknowledged the objective and plain meaning of their papers prior to September 20, 1990. The Memorandum constituted a change in position and has no reasonable, factual predicate in this litigation. The government knew that its own papers "conveyed the distinct impression that these promotions were an accomplished fact," *see Trout v. Garrett, supra*, 780 F.Supp. at 1427 (citing defendants' Memorandum of September 20, 1990), yet it chose to alter

the position it had created and now vehemently defends its unqualified right to do so. Given the government's awareness of the objective meaning of its own papers and its simultaneous determination to assert a change of position, and the unseemly strategy of the government throughout the case, it can only be concluded that the government chose to do so in order further to delay the litigation and to harass the plaintiffs.[14]

## IV

### Imposition of Sanctions

Although the Court concludes that Rule 11 was violated, it will not impose sanctions. To be sure, this Court, as well as others, has held that where a violation of Rule 11 occurs, sanctions are required. *Trout v. Garrett, supra,* 780 F.Supp. at 1429; *Saltany v. Reagan,* 886 F.2d 438, 439 (D.C.Cir., 1989), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990), *citing Weil v. Markowitz,* 829 F.2d 166, 171 (D.C.Cir.1987); *Westmoreland v. CBS, Inc., supra,* 770 F.2d at 1174–75. Nonetheless, Rule 11 should not be read with a jeweler's loupe so that the rigidities of the Rule loom so large as to obscure the realities of the litigation and the purposes of the Rule itself.

■ Respondent Assistant United States Attorney Thomas S. Rees joined this litigation barely two months before this issue arose. The transcript of the hearing before the Special Master in August 1990 reflects the Special Master's acute awareness that Mr. Rees was new to the case and was largely dependent upon others from both the U.S. Attorney's Office and the Navy. *See generally,* Tr. at 339–343. Although Mr. Rees, by his signature on the

Memorandum of September 20, 1990, certified compliance with Rule 11, the Court cannot ignore his necessary reliance on others, *see Threaf Properties Ltd. v. Title Ins. Co.,* 875 F.2d 831, 838 (11th Cir.1989), and his junior status. It would be inequitable to sanction Mr. Rees while those who formulated the Department of Justice policy and insisted on it for years went scot free. For these reasons, sanctions will not be imposed on Mr. Rees.

■ H. Lawrence Garrett III, then serving as Secretary of the Navy, was ordered to respond to the *prima facie* evidence of violation of Rule 11 as a "represented party." Fed.R.Civ.P. 11; *Trout v. Garrett, supra,* 780 F.Supp. at 1428–29. Thereafter, in the wake of controversy revolving around allegations of sexual misconduct against women at the "Tailhook" convention and the Navy's handling of the subsequent investigation, Secretary Garrett resigned, apparently under pressure, on June 26, 1992. On July 7, 1992, the President appointed Sean O'Keefe as Acting Secretary.

Mr. Garrett, in his affidavit to the Court, states that he had no knowledge of this litigation. Anticipating that this might be the case, the Court had given Mr. Garrett the opportunity to identify the individual or individuals who were responsible for the conduct of the litigation on behalf of the defendant. Yet Secretary Garrett neither accepted any responsibility himself nor did he identify any party within the Navy responsible for this case.[15] On this basis, and the Navy's actions enumerated above, the Court could impose sanctions upon Mr. Garrett.

However, the fact is that Secretary Garrett was a defendant in this case—and a

---

**14.** The defendants' willingness to concede nearly half the cases at the first sight of Covington & Burling and the Lawyers Committee for Civil Rights earlier in the litigation also suggests that there was no great legal principle at issue here. Even putting the best face on it, the defendants sought to impose on plaintiffs and the Court a position that they knew they had not articulated before in order to add yet another issue to defendants' litigation barricade and harass the five women whom the Navy concedes were

promised promotions. Thus, the harassment and delay clauses of Rule 11 were violated.

**15.** Defendants' strategy of delay apparently has its roots in the Department of the Navy and, more specifically, the desk of C. John Turnquist, Associate General Counsel for Litigation at the Navy. Mr. Turnquist is not a signatory to any documents and he is not, of course, a represented party in this case. Accordingly, he cannot be the object of sanctions under Rule 11.

respondent to the Show Cause Order—only in his official capacity. *See* 42 U.S.C. § 2000e–16(c). His resignation as Secretary removes him from this case. It is Secretary O'Keefe who is now a defendant and, therefore, the represented party. *See id.* Because he has resigned and is now a private person, the Court has concluded that it would be inappropriate to impose sanctions upon former Secretary Garrett.

■ Likewise, the Court will not impose Rule 11 sanctions upon Secretary O'Keefe. It would be both inconsistent with the purposes of Rule 11 and illogical to impose sanctions when both the Secretary and his administration post-date the filing in question and the Show Cause Order itself. Rule 11 was intended to apply to a broad array of circumstances, including individual and corporate parties, but its application to Secretary O'Keefe would require twisting a hyper-technical reading of the Rule so tight that it would seal off common-sense.

It is of course unfortunate that after all these years of evasive litigation by the Navy, the Court is forced to conclude that, for one reason or another, sanctions should not be imposed on anyone.[16] But the Court has an obligation to be fair and to exercise restraint in the use of power, even if others, including government officials, have displayed different attitudes. On this basis, the Court will not hang the weight of this litigation around the neck of the new Secretary, but present him with an opportunity to end it.

This Court has twice found that the Navy denied these plaintiffs promotions that were due them based on their qualifications.[17] Each of these women, dedicated to civilian careers in the Navy, provided credible evidence that they were paid less

than men who did the same work, or that they were otherwise discriminated against. More important than the question of sanctions is the issue of substantive relief for the class of plaintiffs in this action.

Employment discrimination, while more insidious than more graphic forms of sexual discrimination, is equally odious. When a woman is paid less for the same work as a man or is denied a promotion because she is a woman, no less than when she is sexually harassed or assaulted, her dignity is offended and the law is violated. It is the Court's hope that today's decision will assist in encouraging the new Navy administration to put an end to the delaying tactics[18] and to concern itself both with preventing sexual discrimination in the future, and with remedying the past discrimination revealed by this case.

## V

### *Period of Backpay Award*

■ The Court now considers plaintiffs' motion for the backpay award for thirty-five prevailing plaintiffs and the related motion to require the Navy to update computerized employment data and to authorize plaintiffs' expert to compute the appropriate additional backpay for 1979 through the present. In its November Opinion the Court ordered specific amounts of backpay for each plaintiff for the 1972–1979 liability period.

Plaintiffs have already calculated additional backpay for thirty-five plaintiffs for the period of 1979 through 1989, during which they continued to work for the Navy using the regression formula adopted by this Court, *see Trout v. Garrett, supra,*

---

**16.** The Court has reached that conclusion only after long and agonizing consideration.

**17.** The "Tailhook" incident, referred to above, is a further and independent indication of the Navy's treatment of women.

**18.** Since the Navy is litigating with funds provided by the taxpayers, it therefore as a practical matter has available unlimited resources. The Navy could presumably extend this litigation almost indefinitely, by continuing, in concert with the Department of Justice, to raise

new issues, no matter how frivolous, and by proceeding in appellate courts again and again until the plaintiffs and their counsel are finally financially and otherwise exhausted. It would be to the benefit of all parties if the Navy discarded this counterproductive strategy and embarked on a new path. Were this Court faced with additional conduct by the Navy or Justice counsel which violated Rule 11, all parties involved could confidently expect a different outcome on the issue of sanctions.

780 F.Supp. at 1411–20, and they request that this Court enter judgment for that amount. In addition, plaintiffs move that the Court order the Navy to make available to them the necessary employment data so that further backpay may be calculated by plaintiffs' expert for plaintiffs who remained in the Navy from 1989 through the present.

The Court will award backpay for the prevailing plaintiffs for the period of 1979 through the present.

First. Plaintiffs' motions are consistent with this Court's previous conclusion that the class members are entitled to "retroactive promotions and backpay to the present." *Trout v. Ball*, No. 73–0055, slip op. at 2 (D.D.C. May 24, 1989).[19]

Second. Extension of the backpay recovery period to the present is also appropriate and relevant to the discussion above if only because it is defendants' overzealous litigation strategy that has delayed this litigation and denied plaintiffs any recovery. The enlarged backpay period will compensate plaintiffs not only for the period in which they suffered direct discrimination, but additionally, for the period in which recovery has been delayed by defendants.

Third. The expanded relief period is consistent with the "make whole" purpose of backpay. *See Kraszewski v. State Farm General Ins. Co.*, 912 F.2d 1182, 1184 (9th Cir.1990), *cert. denied*, ⸺ U.S. ⸺, 111 S.Ct. 1414, 113 L.Ed.2d 467 (1991). As the Supreme Court has instructed, the "injured party is to be placed, as near as may be, in the situation [s]he would have occupied if the wrong had not been committed." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419–20, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). To that end Congress vested the courts with discretion to "fashion the most complete relief possible." *Id.* at 421, 95 S.Ct. at 2373. Accordingly, courts have awarded backpay in employment discrimi-

nation cases for a period up to the entry of judgment. *See, e.g., Kraszewski, supra.*

Plaintiffs' motions, however, would require the Court awkwardly to divide up the backpay, issuing monies for 1979–1989 for thirty-five of the plaintiffs and the remainder to be awarded after plaintiffs have done further calculations. Rather, the Court will order the Navy to make available to plaintiffs the necessary computerized employment data to enable plaintiffs' expert to calculate backpay for the prevailing class for the period 1979 through the present. Plaintiffs will thereafter have forty-five days in which to calculate backpay and present it to the Court for award. The Court will then review the full calculations, with the assistance of defendants' opposition or comments, if any, and award the backpay at one time rather than in stages. Once the Court has entered awards for backpay for the period of 1979 through the present only the issue of attorneys' fees will remain. Thus, once the issue of additional backpay has been resolved, the Court expects to issue a judgment in the case.

**19.** Defendants argue that the Special Master's failure to enlarge the award period is to the contrary. However, this Court's Order of Reference limited the Special Master's jurisdiction to backpay through April 30, 1979. Defendants' objection is thus typically disingenuous. Defendants themselves, in papers filed earlier in the litigation, quote a transcript of a hearing before the Special Master, in which they state, "Judge Greene specifically reserved 1979–1989 for his consideration." Defendants' Response to Plaintiffs' Notice of Recent Decisions at 8 (Nov. 22, 1991). Plaintiffs' motion is properly before the Court.